BERNARD A. WECHT, LEONARD EMERSON, SOUTHERN UNION PRODUCTION COMPANY, AND OTHERS, APPELLANTS, *v.* CHARLES A. ANDERSON, C. G. PERKINS, W. J. HACHT, AND OTHERS, RESPONDENTS.

No. 5469

August 27, 1968 444 P.2d 501

*James L. Wadsworth,* of Pioche, and *Harry Kozart,* of Philadelphia, Pennsylvania, for Appellant Wecht.

*Wilson and Wilson,* of Elko, for Appellant Emerson.

*Gray, Horton & Hill,* of Reno, for Appellant Southern Union Production Company.

*Cooke & Roberts,* of Reno, for Respondent Anderson.

*Earl & Earl,* of Las Vegas, and *Christy, Kleinman, Hoyt & Fuller,* of Phoenix, Arizona, for Respondents Perkins and Hacht.

**OPINION**

By the Court, THOMPSON, C. J.:

Two cases, consolidated for trial in the district court, concern the ownership and right to possession of the Andies group

of 21 unpatented mining claims in Lincoln County. The target of each case is a 78 year old Nevada prospector, Charles Anderson, and the heirs of his boyhood friend Rubin Robinson. The certificates of location for all of the Andies claims except one were recorded in the names of Anderson and Robinson, and the one claim in the name of Anderson alone. Accordingly, they assert ownership of all claims by reason of having perfected them in accordance with law.

The appellant Wecht, a Philadelphia lawyer, and eight other persons claim ownership by virtue of two documents executed by Anderson and Robinson. The first, a 1955 grubstake agreement which the Wecht group contends embraces the Andies claims; and, the second, a 1960 deed to the claims executed in conjunction with other documents. The Wecht group commenced an action to quiet title to the Andies claims.

The appellant Emerson and three other persons assert a right to possession of the claims under a 1964 lease and option from Anderson and Robinson, and commenced suit to secure their possessory rights. The two cases were consolidated and, following a protracted trial, the court found that: (1) Anderson and the heirs of Robinson are the owners of and entitled to possession of the Andies claims, and quieted their title against the other parties asserting title and the right to possession; (2) the grubstake agreement with the Wecht group did not embrace the Andies claims, and the 1960 deed to Wecht was void for fraud; (3) the 1964 lease and option to the Emerson group was forfeited for material breach by the lessees. This appeal by the Wecht group and the Emerson group ensued.[1] Since substantial evidence supports the judgment below, and no legal error appears, we affirm.

1. Wecht v. Anderson.

(a) The grubstake agreement: On April 11, 1955, Anderson and Robinson entered into a grubstake agreement with nine Pennsylvania contributors, one of whom was Wecht who also acted as attorney for the group and drew up the agreement. This agreement provided that $1,000 would be raised to enable Anderson to "purchase a Geiger Counter and/or Scintillator and such other equipment or instruments as he may require for prospecting for precious metals in the field, including but not limited to uranium," and of "any such deposits

---

[1]Southern Union Production Co. is also an appellant. It holds a lease and option from the Wecht group, and rises or falls with Wecht.

Perkins-Hacht are respondents along with Anderson, et al., and hold a lease and option from Anderson. Their success depends upon affirmance of the judgment for Anderson, et al.

found," they were to be registered in the names of Anderson and Robinson as co-owners and trustees for the syndicate. The agreement also specified that "the syndicate is organized for a period of one year from the date hereof."

Shortly after this document was executed Anderson received several checks totalling $800 of the $1,000 agreed upon. This was all of the money ever advanced by the syndicate. He immediately purchased a Geiger counter ($500), tires for his truck ($95), and other necessary prospecting equipment and set off in quest of uranium. Within 30 days the remaining grubstake money had been exhausted, but he continued to explore the Battle Mountain area and "all through Death Valley." Uranium eluded him and the old prospector turned his attention to the subject property of this case.

In 1919 Anderson had discovered a mineralized deposit in the area of the present Andies claims. He staked a claim at the site but did nothing further to perfect it. On October 20, 1954 he again located that claim and on December 9, 1954 recorded his location certificate. He realized that the area around this first claim might also be valuable and, upon abandonment of the uranium search, returned to Lincoln County "to go down and work and get something done with it." In June and July of 1955, 20 more Andies claims were recorded in the names of Anderson and Robinson. At the time of these locations he was neither being supported by the grubstake money nor utilizing the Geiger counter, since that instrument is useless in the detection of cinnabar. The recited facts are not disputed.

The Wecht group contends that the trial court committed legal error in ruling that the Andies claims are not within the terms of the grubstake. The contention rests mainly on the premise that the filing of the location certificates to 20 claims in the names of Anderson and Robinson during the one year period following the execution of the agreement automatically brings those claims within the terms of the agreement. The district court rejected this contention.

There are sound reasons for the trial court's ruling. First, Andies No. 1 was located and the certificate of location therefor recorded approximately four months before the grubstake agreement was made. The agreement did not mention Andies No. 1, and by its terms referred to claims to be later discovered during the one year effective period of the grubstake. In these circumstances, the contributors to the grubstake could have no interest in Andies No. 1. Hollingsworth v. Tufts, 162

P. 155, 159 (Colo. 1917). The right in property under a grub-stake contract must be acquired by means of the grubstake furnished and pursuant to the grubstake contract. Prince v. Lamb, 60 P. 689, 691 (Cal. 1900).

Second, the 20 other Andies claims which were located and recorded in the names of Anderson and Robinson in June and July of 1955 after the grubstake contract was made, were discovered without the use of either funds or equipment supplied by the syndicate. The funds had long before been exhausted, and the equipment was not adaptive to the location of mercury. Thus, those claims were not acquired by means of the grubstake furnished. Prince v. Lamb, supra; Cisna v. Mallory, 84 F. 851 (Wash. 1898); Johnstone v. Robinson, 16 F. 903 (Colo. 1881). It is interesting to note that the grubstake agreement of April 1955 was amended in August of that year to add two more contributors whose contributions were never received by Anderson. The August amendment did not mention the Andies claims although 20 of them had been located and certificates of location recorded during the two prior months.

Third, it is undisputed that the Wecht group did not fully perform its obligations since Anderson never received the total consideration of $1,000 called for by the grubstake contract. It has been held that full performance by the outfitter is a condition precedent to the prospector's obligation to perform, or continue performance, and the furnishing of some but not all of the supplies contracted for does not satisfy this condition. Murley v. Ennis, 2 Colo. 300 (1874). On the other hand, the prospector did perform. He promptly purchased a Geiger as required by the contract and made a diligent search over a large uranium-potential area. The stake was exhausted through reasonable use before he turned his attention to the Andies claims. This satisfied his obligations under the contract. Jennings v. Rickard, 15 P. 677 (Colo. 1887).

Finally, in the circumstances here presented, the one year specified in the grubstake agreement as its period of duration is not effective to continue the relationship of the parties beyond the exhaustion of the stake, which occurred within a short time after the agreement was made. As a general rule the relationship ends when the stake is exhausted. Here, we do not hesitate to prefer the general rule over the express contractual termination date since the stake was apparently not adequate for the

time period reserved, and was exhausted through diligent exploration and reasonable use.[2]

(b) The 1960 deed: On May 20, 1960 a meeting was held in Philadelphia to discuss a possible lease and option agreement that Wecht was negotiating with two individuals named Swerdfager and Gahagen. Anderson and Robinson were present. The lease was to cover the Andies claims. A tentative lease was prepared, subject to the cancellation of a current lease on the property. As Anderson and Robinson were signing this tentative lease, Wecht presented two additional documents for their signature stating that "they are to guarantee to implement the completion of the Swerdfager transaction." One of the documents was a grant deed to Wecht of the Andies claims. Anderson and Robinson signed automatically without reading them. The Swerdfager-Gahagen transaction was never consummated because a release of the existing lease could not be obtained, and in August of 1960 Wecht returned the $5,000 advance payment which Swerdfager had deposited. But on September 1, 1960 Wecht caused the deed to be placed of record in Lincoln County.

The deed was a nullity when the Swerdfager transaction failed of accomplishment. The grantors never intended a conveyance unless the lease and option to Swerdfager and Gahagen was effectuated. Lanigir v. Arden, 82 Nev. 28, 33, 409 P.2d 891 (1966). The trial court properly voided that conveyance.

2. Emerson v. Anderson.

The Emerson group held a May 1964 lease and option from Anderson and Robinson as lessors. The lease required lessees to construct a 50 ton capacity retort by July 15, 1964 for the purpose of refining mercury. The retort was not constructed by July 15, and lessees were given a one month extension. On August 8 a small mill was moved onto the property, but it was not until January 1965 that it was ever put into operation, and then ineffectively and only for a period of about five hours. Through expert testimony it was established that the mill had

---

[2]Circumstances may sometimes exist which would persuade a court to prefer the contract termination date over the general rule. For example, it might be inequitable to deny relief to an outfitter who has supplied a substantial stake which the prospector dissipates prior to the termination date established by the contract. Each case must be decided on its own facts. For a discussion see: 3 American Law of Mining 61 (1967).

no more than a ten ton capacity, and could never be made to process any additional amount.

In December 1964, the lessors notified the lessees of the lessors' intention to terminate the lease, mainly for failure to construct a 50 ton retort, and returned the December rent check. The lessees denied their breach, sent back the rent, and asserted the right to either cure the default or purchase the property within a 60 day grace period allowed by the lease. The lessees did neither during the grace period and, in March of 1965, removed their working force from the property and ceased all operations. A material breach by the lessees thus clearly appears from the record before us.

They seek to excuse their default on two grounds: first, that the lessors' 1960 conveyance of the property to Wecht (which we have declared void) was an anticipatory breach by the lessors excusing further performance by the lessees. This cannot be so since the lessees' breach occurred long before they learned of the deed to Wecht (that knowledge was acquired by lessees in January 1965) and thus, there can be no connection between the two events.

Next, the lessees seek to avoid forfeiture, asserting a waiver of their breach by the conduct of the lessors in accepting rent during the 60 day period within which the lessees could elect to purchase. The lessees had been notified that forfeiture for breach was being declared, but were permitted to remain on the property to either cure the default or purchase as provided in the lease. When the lessees did neither, the lessors enforced the forfeiture. The lessors' acceptance of rent while the lessees were in possession and deciding upon a course of action, was proper, and did not nullify or waive the declaration of forfeiture made two months earlier.

Other assignments of error have been considered and are without substance.

Affirmed.

ZENOFF and BATJER, JJ., CRAVEN, D. J., and BABCOCK, D. J., concur.