INTERNATIONAL INDUSTRIES, INC., A CALIFORNIA CORPORATION, APPELLANT, v. UNITED MORTGAGE CO., A NEVADA CORPORATION, RESPONDENT.

No. 9653

February 6, 1980                                              606 P.2d 163

*Albright & McGimsey,* Las Vegas; and *Lionel Sawyer & Collins,* Las Vegas, for Appellant.

*Deaner, Deaner & Reynolds,* Las Vegas, for Respondent.

## OPINION

By the Court, BATJER, J.:

Appellant, International Industries, Inc., appeals from a judgment declaring its lease with respondent, United Mortgage, terminated as of May 8, 1975, and awarding to United attorney's fees in the amount of $750. We affirm the declaratory judgment but reverse the award of attorney's fees.

International argues that it cured all defaults before United could effectively terminate the lease and that the district judge erred in reaching the opposite conclusion. Furthermore, International challenges the award of attorney's fees.

On February 18, 1972, United leased to International real property located in Las Vegas. The lease was for a period of 20 years with an annual rent of $41,377.20, payable in equal monthly installments on the first day of each calendar month. Pursuant to the lease, International was to pay, before delinquency, all taxes and assessments. Paragraph 12 of the lease set forth the procedure to be followed if International defaulted in payment of the rent or taxes, stating that

> If Tenant defaults in any of the covenants or agreements on its part to be performed hereunder, and if Tenant fails to cure such default within thirty (30) days, after receipt of written notice from Landlord, or after the expiration of a reasonable time from receipt of such notice if such default could not be cured within thirty (30) days by Tenant's diligent efforts, then Landlord may at its option, at any time thereafter during the continuance of such default, declare this lease terminated, reenter and take possession of the Premises pursuant to applicable provisions of law.

International subleased the premises to Frank H. Slaven, who made timely rent payments to it until International's lease was terminated. International, however, was late in making 11 of its rent payments in 1974 and 1975. On each of the eleven occasions, United's treasurer sent delinquency notices and requested that International pay on time in the future.

On March 26, 1975, United received a notice of delinquent taxes for 1973–1974. At that point, United's attorney became

involved. He sent a Notice of Default to International on April 2, 1975, advising it that the March 1, 1975, rent, the April 1, 1975, rent, and the real property taxes plus interest thereon were unpaid. The notice stated that

> This default is declared pursuant to Paragraph #12 of the Lease, and unless the defaults are cured within thirty (30) days from receipt of this Notice, I have been authorized to declare the lease terminated, and to take whatever steps are necessary to recover the premises.

By the time the 30-day grace period expired on May 7, 1975, United had received and cashed a check for the rent due March 1. On May 8, 1975, United sent a letter to Frank Slaven, the sublessee, instructing him to pay all future rent to United or to vacate, because the lease with International had been terminated on that date.

International's April rent check was also sent on May 8, 1975, but did not reach United until May 13, 1975. United returned the check to International along with a letter stating that the lease had been terminated effective May 8, 1975. International received the termination letter and check on May 16, 1975.

International had paid the taxes due, except for the interest charge, by the end of March, 1975. The Assistant County Treasurer called International and was told that the remaining amount was forthcoming. Approximately two weeks later, he called again and was told the same thing. After another two weeks passed without payment, International's previous checks were returned because they were insufficient to cover the amount due. Some time after May 8, 1975, and before May 15, 1975, International's check of final tax payment was received, dated May 8, 1975. The Assistant County Treasurer held the final check until the checks he had sent back were returned to him. On May 15, 1975, tax redemption receipts were written.

The trial court found that the defaults were not timely cured and that United had effectively terminated the lease on May 8, 1975.

For the first time on appeal, International asserts that Paragraph 13 of the lease permits the withholding of rent in the event of a transfer of title without written notice to International.[1] United Mortgage Co. transferred title to the lease to

---

[1] Paragraph 13. NON–DEFAULT OF TENANT: It is understood and agreed that in the event of any change in or transfer of title of Landlord in or to the demised Premises, or any part thereof, whether voluntary or involuntary, or by the act of Landlord or by operation of law, Tenant shall be under no obligation to pay rents thereafter accruing until notified in writing by Landlord

United Mortgage Trust soon after the lease was executed. Consequently, according to International, it could withhold rent without suffering a default.

We need not consider this issue because it was not raised at the trial. Central Bank v. Baldwin, 94 Nev. 581, 583 P.2d 1087 (1978), Penrose v. O'Hara, 92 Nev. 685, 557 P.2d 276 (1976). Nevertheless, the argument is without merit. International was not aware of the transfer at the time of the default. It cannot now claim that it relied upon the assignment as an excuse for its late payment of rent and taxes. *See* Wecht v. Anderson, 84 Nev. 500, 444 P.2d 501 (1968).

International's primary contention is that all defaults were cured before the lease was effectively terminated. International argues that the termination was not effective until it received notice of the termination on May 16, 1975. Because it had tendered all amounts due by May 15, 1975, International asserts that the lease was not terminated during the continuance of the default as required by Paragraph 12 of the lease.

We turn first to the issue of the validity of United's termination of the lease on May 8, 1975. By its terms, the lease requires only that the lessor give the lessee written notice of default and thirty days to cure such default. There is no requirement of a written notice of termination.[2] However, International argues that some affirmative act by United, after the grace period, was required to terminate the lease.

When a forteiture is not automatic upon failure to cure a default, but the lessor may elect to terminate the lease, then it is necessary that the lessor make a declaration of forfeiture or formal reentry, or do some unequivocal act that signifies an election to terminate. Padilla v. Sais, 414 P.2d 223 (N.M. 1966); Maretz v. Apuzzo, 378 A.2d 1082 (Conn.App. 1977).

In this case, United warned International that it would

---

of such change in title and being given satisfactory proof thereof, and that the witholding of such rents in the meantime shall not be in any sense a default upon the part of Tenant.

[2]NRS 40.253 does not require a written notice of the lessor's decision to terminate the lease either. That section provides that if the tenant fails to cure the default in rent payments within five days after a notice requiring payment or surrender, then the lessor may retake possession of the premises in a peaceable manner. The lease in question extends the grace period.

declare the lease terminated if the defaults were not cured by May 7, 1975.[3] We agree with the trial court that United's letter to the sublessee Slaven on May 8, 1975, was sufficient to effectuate a termination of the lease because it declared the lease terminated and implicitly gave notice of United's intent to reenter if Slaven decided to vacate rather than enter into a lease arrangement with United. Furthermore, as soon as United received the April rent check on May 13, 1975, it returned the check to International with actual notice of the termination.

We reject International's complaint that United's notice to Slaven was an improper interference with the contractual relationship between Slaven and International. International's attempt to remain as "middleman" in order to profit from the difference between the rent payable under the main lease and the higher rent payable under the sublease cannot succeed. A lessor is free to lease to a former sublessee or to anyone else after a lease is terminated, because the sublease falls with the main lease. *See* Russell v. Park City Utah Corporation, 548 P.2d 889, *cert. denied* 429 U.S. 860 (Utah 1976); Gibbs v. Stanfill, 146 So.2d 418 (La.App. 1962).

Having concluded that the lease was validly terminated, we now consider whether or not the defaults were cured in time to foreclose termination of the lease. International appears to argue that, even if the May 8, 1975, notice to the sublessee Slaven was a sufficient declaration of termination, all defaults were cured on May 8 by posting the April rent check and the check for delinquent taxes plus interest on that date. There being no continuing default, according to International, United was precluded from terminating the lease.

International cites Fant v. Miller, 218 S.W.2d 901 (Tex.Civ.App. 1949), for the proposition that payment is made when the remittance is deposited in the mail. In *Fant,* the court refused to allow the lessor to terminate the lease for late payment of rent when the payment was made by a check posted on the day the rent was due and was received by the lessor the following day. We also have refused to permit a forfeiture

[3]Although the April 2, 1975, notice of default was not technically perfect and therefore could not satisfy the prerequisite to an unlawful detainer action, it was properly considered here because it did notify International of United's intent to declare the lease terminated if the defaults were not cured in 30 days. *Cf.* American Fence, Inc. v. Wham, 95 Nev. 788, 603 P.2d 274 (1979) (Notice of Termination could be asserted as defense in action for specific performance of option despite noncompliance with statutory requirements for unlawful detainer action.).

based upon a technical breach of the lease. *See e.g.* Summa Corp. v. Richardson, 93 Nev. 228, 564 P.2d 181 (1977). In this case, however, International did not attempt to make a timely payment. The overdue rent and the interest on the delinquent taxes were not even mailed until after the thirty-day grace period had expired.

Absent legal excuse or justification, only a tender of the full amount due made before a declaration of termination can preclude the lessor from electing to terminate the lease. A tender requires that the debtor produce the money and place it in the control of the creditor. Mayron's Bake Shops, Inc. v. Arrow Stores, Inc., 176 A.2d 574 (Conn. 1961), Thrifty Supply Co. of Seattle v. Deverian Bldrs., Inc., 475 P.2d 905 (Wash.App. 1970) (payment established only with receipt of funds by creditors). There was no tender of the overdue rent in this case until May 13, 1975, when United received the April rent check. By that time, it was too late to avoid a forfeiture. *Cf.* Fry v. D. H. Overmyer Co., Inc., 525 P.2d 140 (Or. 1974) (purported "telephone tender" of overdue rent made 4 days before expiration of grace period did not prevent forfeiture of lease).

The maxim that equity abhors a forfeiture will not aid International. We concur with the trial court's conclusion that International's persistent failure to pay rent and taxes pursuant to the terms of the lease, without any legal justification or excuse, indicates an absence of good faith. *Accord,* Groendycke v. Ellis, 470 P.2d 832 (Kan. 1970); Cambridge v. Webb, 244 P.2d 505 (Cal.App. 1952). Under the circumstances of this case, it is not inequitable to enforce a forfeiture of the lease.

International also challenges the award of attorney's fees. United counterclaimed for a declaration that the lease was terminated and for costs and attorney's fees. It simply alleged that legal counsel was necessary to defend against the declaratory relief action and to prosecute the counterclaim, and that it was entitled to attorney's fees.

NRS 18.010(2)(b) states that "The court may make an allowance of attorney's fees to: . . . [t]he counterclaimant as prevailing party when he has not recovered more than $10,000." We held in City of Las Vegas v. Cragin Industries, 86 Nev. 933, 478 P.2d 585 (1970), that where neither damages nor attorney's fees as damages were awarded, the award of attorney's fees

was not authorized by NRS 18.010(3)(a).[4] The section discussed in *Cragin* and NRS 18.010(2)(b) each require that the prevailing party not recover more than $10,000. We construed that language to mean that an award of a money judgment is a prerequisite to an award of attorney's fees. *Compare,* Wiley v. Cook, 94 Nev. 558, 583 P.2d 1076 (1978) (successful counterclaim defendant could recover attorney's fees under NRS 18.010(2)(c) which requires only that plaintiff has not sought recovery in excess of $10,000).[5]

In this case, United did not recover compensatory damages nor attorney's fees as damages. Therefore, the award of attorney's fees was improper.

The judgment declaring the lease to be validly terminated is affirmed. The award of attorney's fees is reversed.

MOWBRAY, C. J., and THOMPSON, GUNDERSON, and MANOUKIAN, JJ., concur.

---

[4]NRS 18.010(3)(a) is now NRS 18.010(2)(a).
NRS 18.010   Award of attorney's fees.

. . . .

2.   The court may make an allowance of attorney's fees to:
(a) The plaintiff as prevailing party when the plaintiff has not recovered more than $10,000.

[5]NRS 18.010(2)(c) does not apply in this case because International sought more than $10,000 damages.