Robert L. Rowe, Appellant, v Great Atlantic & Pacific Tea Company Inc., et al., Respondents.

Second Department, March 6, 1978

474

### APPEARANCES OF COUNSEL

*Abraham D. Sofaer* for appellant.

*Gordon C. Sammis* for Great Atlantic & Pacific Tea Company, Inc., respondent.

*St. John & Dougherty (Thomas P. Dougherty* of counsel), for Southland Corp., respondent.

### OPINION OF THE COURT

RABIN, J.

This is a special proceeding pursuant to section 701 of the Real Property Actions and Proceedings Law to recover possession of certain commercial premises and for rent due and unpaid. The novel issue presented on this appeal is whether, in the absence of a contrary provision, a lease which requires payment in the form of a fixed base rent plus a percentage of the lessee's gross sales, may be assigned by the lessee without the lessor's consent.

In 1964 petitioner-appellant, Robert L. Rowe, entered into an agreement with The Great Atlantic & Pacific Tea Company (A & P), the lessee, for the erection and lease of certain premises located in Sag Harbor, New York. Pursuant to the

agreement, Rowe erected a building of approximately 8,700 square feet designed for use as an A & P supermarket. The lease term was for a period of 10 years at a fixed annual rental of approximately $14,000. Two seven-year renewal options were available at an annual fixed rent of $13,500. The lease, drafted by A & P, contained no reference to assignability.

In 1970 A & P approached Rowe for the purpose of expanding the premises and renegotiating the lease. Rowe, who had attempted to renegotiate the lease in 1968, immediately advised A & P that he "would only be agreeable or interested in expanding the store, enlarging it, providing that * * * [he] would obtain from the new lease a fair return on * * * [his] total investment in the store; that any contract that resulted had to be an overall approach to the problem." A & P, unwilling to pay a significantly higher rate of fixed rent, suggested the risk-sharing alternative of a percentage lease. Although no guarantees were made, it was projected that sales would soon exceed $2,340,000. The parties finally agreed upon a modification of the lease under which petitioner would enlarge the premises by 6,313 square feet and, in return, A & P would pay, for a period of 15 years, an annual rental of $34,420 plus 1½% of all annual sales in excess of $2,294,666 and less than $5,000,000. Petitioner also granted to A & P three seven-year renewal options at the same stated rental. The expansion of the premises was made in accordance with A & P's specifications and design.

For the purpose of computing the percentage rental, the term annual sales was given a broad definition which essentially referred to A & P's gross receipts for the sale of merchandise. The lease modification excluded many items from gross receipts: "The term 'sales' is hereby defined as the gross receipts of LESSEE in and from the demised premises, excluding or subtracting therefrom however (1) deposit refunds and credits, (2) refunds and allowances for merchandise returned, (3) any sums paid, charged or collected as an incident to or measured by receipts or sales whether or not any such sums be known as sales, receipts or income taxes, excise taxes, or by any other name, which LESSEE may be obligated to collect and/or pay as a result of any law or enacted [sic], (4) cost of trading stamps issued by LESSEE to its customers, (5) sums paid by LESSEE for commercial, rent, occupancy or occupational tax or permit, (6) receipts or commissions from public

pay telephones, (7) receipts or commissions from vending machines or weighing machines, (8) receipts from delivery service, if any, (9) credits accruing to said store arising from transfer * * * [of] merchandise from said store to other stores or locations, (10) returns to LESSEE's warehouse or to shippers, suppliers or manufacturers, (11) returns and allowances as such terms are known and used by LESSEE in the preparation of LESSEE's profit and loss statement, (12) receipts from sales of salvage cartons, meat scraps, suet, and other salvage merchandise, (13) payments received by LESSEE elsewhere than at the leased premises on orders taken at the leased premises but filled elsewhere, (14) exchange of goods between LESSEE's STORES, (15) receipts from sales of postage stamps and money orders." Each payment of percentage rental was to be accompanied by a statement showing the amount of sales for the preceding year. The form of the statement was to be decided upon by Rowe and A & P and the statement was to be signed by a responsible official of A & P's unit at the leased premises.

The 1971 lease modification specifically provides that it is the "desire of the parties * * * [to] increase the total area to be included in the leased premises and establish a new annual rental for the total area." Like the original lease, the modification was drafted by A & P and contained no reference to assignability.

In 1975, A & P, as part of a general policy of economic retrenchment, decided to close its store in Sag Harbor and, despite Rowe's vigorous objections, assigned the lease to respondent The Southland Corp., which operates a supermarket chain known as Gristede Brothers (Gristede's).

Thereupon, Rowe commenced the instant proceeding. Because several issues of first impression were raised, Special Term entertained jurisdiction and ordered the proceeding to be tried within the framework of the following conclusions of law:

In order to succeed, the petitioner would have to prove (a) bad faith on the part of A & P in making the lease and assigning it or (b) that the fixed base rent of $34,420 per year is so low in comparison with other similar rental agreements that the lease agreement, without the percentage clause, is unconscionable and could not possibly have represented the intention of the parties, and (c) that Gristede's cannot, in fact, have annual sales in excess of $2,294,666 and that A & P did have such sales.

After a nonjury trial, Trial Term concluded that petitioner was not entitled to the relief he was seeking and dismissed the petition. Trial Term's determination was made within the strict framework set forth by Special Term when it directed that the proceeding be tried. We disagree with that framework and with the determination made thereon.

■ As a general rule, leases are freely assignable in the absence of a specific provision prohibiting assignments (34 NY Jur, Landlord and Tenant, §§ 215, 219). However, a covenant against unilateral assignment will be implied if the parties clearly intended it or if the covenant is necessary to give meaning and effect to the agreement as a whole (*Tuttle v Grant Co.*, 5 AD2d 370, revd 6 NY2d 754). Consequently, a lease having no express provision dealing with assignment may, because of its terms and context, be construed to prevent a tenant from assigning his rights and duties over the landlord's objection. The determination of whether to imply such a covenant is necessarily factual in nature, and depends primarily upon the intent of the parties.

■ In determining the parties' intent, two important factors are: (1) whether the fixed portion of the percentage rent constitutes a substantial payment (*Tuttle v Grant Co., supra; Lippman v Sears, Roebuck & Co.*, 44 Cal 2d 136) and (2) whether the percentage leasing agreement depended upon personal services from either party stemming from that party's particular skills and experience (*Nassau Hotel Co. v Barnett & Barse Corp.*, 162 App Div 381, affd 212 NY 568; *Bentley v Textile Banking Co.*, 26 AD2d 112). These factors largely result from the risk-sharing nature of percentage leases and from the mutual covenant of extreme good faith (see *Daitch Crystal Dairies v Neisloss*, 8 AD2d 965, affd 8 NY2d 723).

The question whether the minimum fixed rent is substantial was fully discussed by Mr. Justice HALPERN in his learned dissent in *Tuttle v Grant Co.* (5 AD2d 370, 380-381, *supra):* "the determination of whether a special covenant of the type described is to be implied depends principally upon whether the parties regarded the amount of the stipulated minimum rental as an adequate reflection of the full rental value of the premises or whether they contemplated that the full value would be realized only through the percentage provision. If the parties did not regard the minimum rental as 'substantial and adequate', virtually all the cases hold that a covenant is

to be implied requiring the tenant to exercise diligent efforts to produce the sales which, in turn, would produce the percentage rental to which the parties looked as the primary source of compensation to the landlord. The minimum rental provision then merely serves the function of assuring the landlord that even if the tenant is unsuccessful in his efforts, the landlord will receive some rental for the use of the premises. *(Lippman v Sears, Roebuck & Co., supra; Seggebruch v Stosor,* 309 Ill. App. 385, *supra; Sinclair Refining Co. v Davis,* 47 Ga. App. 601; *Sinclair Refining Co. v Giddens,* 54 Ga. App. 69.)* On the other hand, if the minimum rental was 'substantial and adequate', it may be found that the landlord intended to accept the minimum as a substitute for the tenant's obligation to exert his best efforts to promote sales and hence there is no implication of a covenant on the part of the tenant to use such efforts *(Percoff v Solomon,* 259 Ala. 482). The percentage rental is then regarded as a fortuitous bonus or windfall, which the landlord is to receive, if the volume of business exceeds the expectation of the parties, but the tenant is under no obligation to exert any effort to promote sales upon the premises. However, as we have seen, even in such a case, the landlord is entitled to the benefit of the bonus arrangement for which he bargained. The tenant may not deliberately divert the business by closing the store on the landlord's premises and concurrently opening a new store on near-by premises, and if he does, he is liable for the percentage rental upon the diverted sales *(Selber Bros. v Newstadt's Shoe Stores,* 194 La. 654, same case, after trial 203 La. 316, *supra)."*

The California courts took a similar approach in the leading case of *Lippman v Sears, Roebuck & Co.* (44 Cal 2d 136, *supra),* where the California Supreme Court implied a covenant that the lessee would carry out the lease to insure that the lessor would benefit from the bargained-for percentage. This implied covenant resulted from the court's conclusion that the parties did not intend the minimum rental provision to be a substantial and adequate payment in lieu of payment of a percentage of sales. The facts leading to this conclusion were similar to the facts in the instant proceeding. Thus, Sears' representative told Lippman that the home office would not approve a high fixed rental and suggested the alternative of a percentage lease with a guaranteed minimum. This parallels the negotiations between Rowe and A & P's repre-

sentative. Another similarity is that Lippman, like Rowe, reconstructed the premises in accordance with his lessee's specifications.

■ Neither *Tuttle* nor *Lippman* was directly concerned with assignment of the percentage lease. However, the rationale of those cases is equally applicable to the instant proceeding. The basic principle enunciated in *Tuttle v Grant Co. (supra)* and *Lippman v Sears, Roebuck & Co. (supra)* is that when a landlord agrees to a fixed rent which is not substantial, and depends upon an additional percentage of sales to provide a fair and adequate return, there is an implied covenant that restricts the lessee from purposely acting to the detriment of the intended benefit. In *Tuttle* the majority of the Appellate Division, in dismissing the complaint, determined that the guaranteed minimum was substantial and, therefore, refused to imply any restrictive covenant against the lessee. The dissent argued, and apparently the Court of Appeals agreed, that the question of whether such a covenant should be implied is factual and that extrinsic evidence was properly admissible to explain the ambiguous concept of a substantial fixed rent. In *Lippman v Sears, Roebuck & Co.,* the California Supreme Court implied a covenant after determining that the fixed rent was not substantial. Indeed, the court said that it was unnecessary to make a further determination as to whether the fixed rent was nominal, since the key variable was substantiality.

■ ■ A covenant restricting assignment without the landlord's consent is of the same type as a covenant requiring the tenant to use all diligence in securing sales at the leased premises. The rationale that courts should imply a duty to refrain from diverting sales to a different location (see 61 Harv L Rev 317) encompasses the implication of a restriction on assignments. Both are premised on the requirement of extreme good faith and that the tenant may not be permitted to frustrate the landlord's expected benefit. Since the landlord has agreed to gamble with his tenant on the latter's success, if the agreed minimum rent is not substantial, the landlord should not be compelled, over his vigorous objection, to gamble with another's business acumen. In all percentage leases, the identity of the tenant necessarily affects the landlord's determination of whether to share the risks of the tenant's business venture. When the fixed rent is not substantial, the additional percentage may not be construed as a mere bonus

and, therefore, the identity of the tenant is of particular importance. Consequently, it is proper to imply in a lease a covenant restricting assignments to insure that the landlord will have the benefit of the specific risk-sharing venture for which he bargained.

█ In the instant proceeding, it must be concluded that the fixed rent of $34,420, despite its superficial appearance of substantiality, was, in fact, not contemplated to be a substantial and adequate payment; instead, the parties looked to the additional percentage to provide petitioner with a fair return. Witnesses for both Rowe and A & P characterized the fixed rent as nominal and A & P's expert calculated that the fixed rent would provide only the "very low return of four-and-a-half percent." The characterizations of insubstantiality are fully supported by the experts' calculations that the fixed rent only slightly exceeded expenses. Comparison with other leaseholds further indicates that the fixed rent was not substantial. Additionally, nothing in the record contradicts Rowe's testimony that the percentage rent agreement was proposed as a means of keeping the fixed rent at a minimum level, yet still provide a fair return. The lengthy term of the lease (potentially 36 years), without any change in the fixed rent, is also indicative that the percentage provision was relied upon to provide a continued fair rate of return. The percentage rental was Rowe's only means of protecting himself against inflation.

█ Whether the fixed rental was so insubstantial as to be unconscionable is largely irrelevant and it was error to cast the issue into the narrow framework of unconscionability. That improperly imposed the very difficult burden upon petitioner of proving that the agreement was such that " 'no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other' " (see *Hume v United States*, 132 US 406, 415). The petitioner, having demonstrated that the fixed rent was insubstantial, did not, in addition, have to establish that the rent was so insubstantial as to be shocking to one's conscience.

The trial court also placed improper reliance on the prior lease and its extremely low rate of return. The substantiality of the fixed rent cannot be determined by focusing only on the rate of return attributable to the 6,313 square-foot expansion. The agreement and the trial testimony conclusively show that the parties intended the 1971 modification to be an entirely new lease, terminating the prior lease and fully encompassing

the entire property and the parties' respective obligations. The consideration of $34,420, plus the percentage, was indivisibly applied to the whole premises. Therefore, whether the fixed rent was substantial depends upon the rate of return from the total investment for all premises contained in the lease. As so applied, we find the fixed rent to be insubstantial.

The second factor applicable to the instant proceeding is whether the lease encompasses a personal services relationship. Generally, percentage leases are a risk-sharing device whereby the landlord relies upon the particular skills and reputation of his tenant. In this context, a landlord must exercise particular care in choosing his tenants and any substitution of tenants without the landlord's consent may frustrate the landlord's intention (cf. *Berland Realty Co. v Hahne & Co.,* 26 NJ Super 477, mod 29 NJ Super 316).

■ New York courts have implied a covenant restricting the right of assignment when the subject lease has the indicia of a personal services contract. Thus, in *Bentley v Textile Banking Co.* (26 AD2d 112, *supra)* plaintiff had entered into an agreement with a record company (Riverside) under which it was to receive royalties on the sale of records made from its master tapes. The company went bankrupt and the defendant mortgagor took possession of the tapes. The court held that there was a triable issue as to whether the plaintiff had a right to recover the tapes (p 114): "The contract here was not assignable if it was one involving personal credit and confidence *(Paige v. Faure,* 229 N.Y. 114, 118; 3 N.Y. Jur., Assignments, § 7). This contract depended on the ability and experience of Riverside. Plaintiff's return depended on the number of sales that were made. Contracts of that character are *not* assignable without consent, and a purported assignment is a terminable breach *(Nassau Hotel Co. v. Barnett & Barse,* 162 App. Div. 381, affd. 212 N. Y. 568)." (Emphasis supplied.)

In *Nassau Hotel Co. v Barnett & Barse* (162 App Div 381, affd 212 NY 568, *supra),* the plaintiff hotel owner entered into an agreement whereby it was to lease the premises to Barnett and Barse and they were to conduct the business for it in return for 19% of the gross receipts. Barnett and Barse thereafter organized the Barnett & Barse Corp. and assigned the agreement to the corporation. Barnett then sold all of his stock to Barse. Under those facts, the court agreed with the plaintiff that the agreement was personal to Barnett and Barse and that, in entering into the contract, plaintiff had

relied especially on Barnett's extensive experience in running hotels. The court so held despite the fact that the agreement contained a clause to the effect that it should " 'inure to the benefit of and bind the respective parties hereto, their personal representatives, successors and assigns;" (162 App Div, at p 383). It gathered the intention of the parties not from one clause, but from the entire instrument.

In the present proceeding, there is uncontradicted testimony that Rowe entered into the percentage lease in reliance on his personal relationship with A & P, and upon A & P's historically sound reputation as a merchandiser. Rowe was familiar with A & P's operations and knew that the expansion was designed in anticipation of a volume of $5,000,000. The premises were constructed at the request of, and to the specific requirements of, A & P. The potentially long term of the lease further indicates that Rowe was relying on A & P's long-term occupation of the premises. It is unlikely that Rowe would have entered into a lease with a potential term of 36 years at a fixed rent of only $34,420, other than in reliance upon A & P's ability to have sufficiently large gross receipts to offset inflation and other increased costs by payment of a percentage rent.

The carefully drafted definition of gross receipts is also indicative of a personal relationship between Rowe and A & P. Many of the explicit exclusions from the gross receipts have relevance only to A & P's particular operation. The definition of gross receipts is of paramount importance because it is the basis for calculating the amount of the percentage rent. By gearing this definition to A & P's particular operation, the parties evinced an intent that the lease could not be assigned without consent.

In addition, the lease provision that Rowe and A & P would subsequently decide the form of the statement of the preceding year's gross receipts, and that such statement must be approved by a responsible official of A & P, further indicates that the parties expected to deal with each other throughout the term of the lease.

The record indicates that the nature of Gristede's business is different from that of A & P. The petitioner testified that:

"I informed him that I felt it was a breach of my contract with A & P. I informed him that I would certainly not have negotiated that type or terms of lease with Gristede Brothers for the store, the nature of their business being different.

"They are more of a carriage type or specialty grocery store, as distinguised from the supermarket, large volume operation that A & P was.

"And I told him that I would never enter into a rental agreement based upon a volume business by Gristede's. I would have to have a set rental with other provisions in it and a normal reflection of a return on the investment there."

This testimony, which was largely uncontradicted, demonstrates that assignment of the lease to Gristede's would frustrate the landlord's purpose in entering into a percentage agreement with A & P.

Under these circumstances, we must conclude that Rowe's acceptance of a nominal fixed rent, and assumption of the risk that projected gross sales might not be realized, was premised on A & P's history of reliability and excellent reputation for large volume merchandising. In this sense, the nominal fixed rent and the reliance on A & P's particular experience and skill are intricately related. This combination of factors conclusively demonstrates that the parties intended to restrict transfer of the lease and such a covenant must be implied. Accordingly, A & P's assignment of the lease to Gristede's, over the vigorous objection of the petitioner, constituted a breach of the lease agreement. Therefore, the petitioner is entitled to recover possession of the premises. Although petitioner's brief asks that "A & P should be required to perform its agreement under the lease, and to pay such damages as appellant is able to establish", the petition merely requests "that a final judgment be entered awarding to Petitioner the possession of the premises herein described together with judgment for any rent due and unpaid from Respondent, A & P". In any event, there has been no showing that there is any rent which is due and unpaid. The record indicates that the petitioner has never received any amount as percentage rental and therefore may not prove any such amount as damages. Nor has there been any showing that the annual fixed rent has not been paid. Accordingly, the petitioner is not entitled to damages.

The judgment of the Supreme Court, Suffolk County, entered January 4, 1977, should be reversed, on the law and the facts, with costs, and the petition pursuant to section 701 of the Real Property Actions and Proceedings Law should be granted to the extent of awarding petitioner possession of the premises.

SUOZZI, J. P., SHAPIRO and O'CONNOR, JJ., concur.

Judgment of the Supreme Court, Suffolk County, entered January 4, 1977, reversed, on the law and the facts, with one bill of costs payable jointly by respondents, and petition granted to the extent that petitioner is awarded possession of the subject premises.