**Arthur C. HAACK, Respondent,**

v.

**The GREAT ATLANTIC & PACIFIC TEA COMPANY, and H & K Distributors, Inc., Appellants.**

**No. 41297.**

Missouri Court of Appeals,
Eastern District,
Division Four.

June 3, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 18, 1980.

Application to Transfer Denied
Sept. 9, 1980.

Herzog & Kral, Joseph A. Kral, Richard B. Specter, St. Louis, for A & P.

Julius H. Berg, Clayton, for H & K Distributors.

Alphonso H. Voorhees, Thomas H. Pollihan, Greenfield, Davidson, Mandelstamm & Voorhees, St. Louis, for respondent.

STOCKARD, Special Judge.

This is an action brought by Arthur C. Haack, lessor, against The Great Atlantic & Pacific Tea Company (hereafter "A & P"), lessee, and H & K Distributors, Inc. (hereafter "H & K"), sublessee, for termination of the lease, for possession of the leased premises, and for monetary damages based on an alleged breach of the lease when A & P subleased the premises without the consent of the owner-lessor. A & P filed various counterclaims and a motion for summary judgment. The trial court severed plaintiff's action from the counterclaims, denied A & P's motion for summary judgment, and after trial without a jury entered judgment, certified to be a final judgment for purposes of appeal, in which it declared the lease terminated as of December 31, 1976, awarded plaintiff a judgment for "reasonable rental value of the premises" of $2,392.80 per month from December 31, 1976 until possession is surrendered less $1,500.00 per month which has been paid by A & P from December 31, 1976, and ordered A & P and H & K to surrender possession of the premises by April 1, 1979. After the filing of a supersedeas bond the order relative to vacating the premises was stayed, and this appeal has been perfected.

The plaintiff Arthur C. Haack is the owner of a building located at 600 Manchester, Ballwin, Missouri, which he leased in 1967 to A & P by use of what is generally referred to as a "percentage lease." The lease was for an initial term of twelve years with a base rental of $1,500.00 per month. Also, the lessee had the option to continue the lease for three periods of five years each, with an increased base rental for each period of $50.00 per month. The "percent-

age" provision of the lease provided for a percentage rental of 1¼% of all sales made on the premises over $1,440,000 annually.

From 1967 to June 1975 A & P operated a supermarket on the leased premises. Throughout that period of time A & P's annual sales never exceeded $1,440,000 and percentage rentals were never payable under the terms of the lease. In April of 1975 a representative of A & P informed plaintiff of its intention to close its store after the July 4th holiday. At this time a discussion was had to the effect that A & P would attempt to find a grocery operation for a new tenant to which it could sell the equipment in the building, and it would be released from the lease without penalty. On May 9, 1975 the leased premises were damaged by a storm. Certain emergency repairs were made but final repairs were not completed until approximately ten months later. A & P's representative did not find a tenant, and in July he notified plaintiff that A & P was considering opening a larger supermarket further east on the same street, and in that event A & P would want to "get off the lease entirely," but would insist that the premises be re-leased to other than a grocery store if the new store was opened. This new and larger supermarket was not opened by A & P. The area real estate manager for A & P testified that because of the inability to find a grocery tenant, A & P was forced to approach the problem by a sublease to a non-food operator, but plaintiff testified that he was never so advised.

A meeting was held on December 15, 1975 pertaining to the needed repairs to the building resulting from the storm damage. At this meeting the representative of A & P advised plaintiff that he "had a party that was interested and [he] wanted the [repairs] completed for occupancy," and plaintiff replied he would have the repairs completed as soon as possible. On the following day A & P executed a sublease to H & K to conduct a retail furniture business in the building under the name of Manor House Furniture. The sublease was dated November 14, 1975, and had been executed by H & K a few days thereafter. It is to be assumed that A & P's representative at the December 15 meeting knew about the sublease and the name and nature of the business of the sublessee, but apparently he did not advise plaintiff, and he did not request permission from plaintiff to sublease the premises.

Plaintiff testified that near the end of December 1975 he had reports from sources other than A & P of a possible new occupant of his building. About this time plaintiff was at the premises when a truck arrived with furniture. Plaintiff told the driver there was no furniture store there and that he had the wrong address, but the driver produced a delivery slip or ticket containing that address.

On January 22, 1976 plaintiff wrote A & P in which he stated that he understood that it contemplated subleasing the premises to a furniture store, and then stated: "Since under the lease dated July 15, 1967 pertaining to said premises, I am entitled to percentage rent on sales in excess of certain minimums and less than certain maximums, I have a substantial interest in who the subtenant is. For that reason, I am hereby requesting that you forward to me information concerning the sales and financial standing of the subtenant. I am especially interested in the amount of sales anticipated from this location. Please let me have the information as soon as possible so that there will be no delay in my determining whether or not to consent to the sublease."

On February 10, A & P replied as follows:

"As requested in your letter of January 22, 1976, we are writing to advise you formally of our intention to sublease the premises and to request your approval of the sublesse.

"A lease has been consummated with H & K Distributors, a St. Louis, Missouri based furniture distributing company with an address of 10317 Corbeil Drive, St. Louis, Missouri, 63141.

"Mr. Donald L. Holtzman, President of the Company, has been in the furniture business for over twenty-five years. In 1970 Mr. Holtzman sold his group of re-

tail stores in St. Louis and confined his operations as a furniture distributor in the area. He now plans to expand once again in to the retail field. Mr. Holtzman has an approved loan from the Plaza Bank, 12011 Marine Avenue, St. Louis. Estimated sales for the retail store and distributorship operations are in excess of $750,000. * * *." [1]

On March 2 plaintiff wrote A & P that the "proposed tenant will not generate sales from the * * * premises in excess of $1,440,000 which would produce the percentage rental called for in the lease. It would seem that there is no reasonable likelihood that this proposed tenant would approach this figure. For that reason I must withhold my approval of the subtenant. * * *."

The lease provided that the lessee could use the premises for any lawful purpose including the operation of a general merchandising business, or it could vacate or sublet all or any part of the premises or assign the lease, but the lessee would not thereby be relieved of the minimum rental liability, and it further provided that "such sub-letting shall be subject to the approval of Lessor, such approval shall not be unreasonably withheld."

Appellants' first point on this appeal is that the trial court erred in ruling that plaintiff-respondent's consent to H & K as a subtenant was not unreasonably withheld "because H & K is an acceptable tenant under commonly accepted commercial standards in that H & K qualifies under plaintiff's objective standards, is financially responsible and H & K's furniture business is legal, suitable for the premises and not offensive to the community."

■ The evidence clearly justifies the finding that before sublease was executed A & P did not inform plaintiff of the identify of the sublessee or request his approval. By entering into the sublease without the consent of the lessor A & P breached the lease, but consent could be given thereafter,

and since A & P now asserts that consent was unreasonably withheld, it had the burden to establish unreasonableness.

For the purposes of this appeal it may be assumed that H & K was financially responsible. That is not of great importance because the record clearly shows that it would be unreasonable to assume that the sales of H & K would at any time during the maximum possible term of the lease require the payment of percentage rentals, and A & P, who admittedly is financially responsible, is not relieved of its obligation to pay the lessor the stated base rental. Also, we may assume that the building is suitable for a furniture store, that H & K's business is legal, suitable for the premises, and not offensive to the community. The first point of appellants actually leaves unchallenged the position taken by plaintiff in his letter dated March 2, 1976 in which he stated that there was not a "reasonable likelihood" that the proposed tenant would generate sales from the premises which would produce a percentage rental, and for "that reason" he was withholding approval of the subtenant. Appellants make no contention that plaintiff's statement in his letter of March 2 as to the "reasonable likelihood" of H & K's sales creating percentage rentals is factually incorrect, and we assume that it was not. Notwithstanding the limited challenge set forth in their point, appellants argue in their brief that "H & K's inability to generate percentage rentals is an 'unreasonable' standard upon which to withhold consent."

Some explanation of the purpose and use of the percentage lease is helpful if not essential to a complete understanding of the issues. Clarence Turley, a prominent real estate dealer in the St. Louis area, testified concerning the nature and purpose of such leases. From a landlord's standpoint it is desirable to have the minimum payment equal the fair market rental, but it is a common practice for large supermarket chains and other desirable tenants to

---

1. Mr. Holtzman denied that he furnished this figure to A & P, and there is no explanation of its source.

obtain a minimum rental below the fair market rental in return for a potential increase in rental through the percentage clause. Plaintiff's tenant prior to A & P was paying $2,000.00 a month, and the minimum monthly rental for A & P was $1,500.00. One of the purposes of a percentage lease is a hedge against inflation, because as the sales volume rises due to inflation the rent automatically rises with it. According to Mr. Turley different businesses are treated differently in percentage leases. In a supermarket the sales volume is high and the mark-up on the products is low. Therefore, a high volume of sales is necessary to create a reasonable profit. In other businesses, the furniture business being one, the sales volume is much lower but the mark-up is much higher. In this case A & P had sales at the premises of over $1,000,000.00 annually and lost money paying $1,500.00 a month rent, but H & K's "breakeven point" was $25,000.00 of sales per month even though it was paying A & P almost $900.00 rent per month more than A & P was paying to plaintiff.

Although there are some cases to the contrary, *Arlu Associates, Inc. v. Rosner,* 14 A.D.2d 272, 220 N.Y.S.2d 288 (1961), almost all jurisdictions consider the clause in a lease providing that a required consent to a subletting not to be unreasonably withheld is a covenant on the part of the lessor. See the cases cited in § 3 of the annotation at 54 A.L.R.3d 679, entitled "Construction and effect of provision in lease that consent to subletting or assignment will not be arbitrarily or unreasonably withheld." The basic and decisive issue here is whether consent to the sublease by A & P to H & K was "unreasonably withheld" by plaintiff when the basis for his refusal was that there was "no reasonable likelihood" that the sales of H & K would "approach" the amount provided for in the lease to generate percentage rentals.

In *Broad & Branford Place Corp. v. J. J. Hockenjos Co.,* 132 N.J.L. 229, 39 A.2d 80, 82 (1944), the lease prohibited a sublease except with the written consent of the lessor which should not be "unreasonably withheld." It was held that arbitrary consideration of personal taste, sensibility, or convenience do not constitute the criteria of the landlord's duty under such an agreement, and that mere whim or caprice, however honest the judgment, will not suffice. "The standard is the action of a reasonable man in the landlord's position. What would a reasonable man do in the like circumstances? The term 'reasonable' is relative and not readily definable. As here used, it connotes action according to the dictates of reason—such as is just, fair and suitable in the circumstances." In cases not pertaining to the particular clause in a lease involved here, the term "unreasonable" has been defined as conveying the same idea as irrational, foolish, unwise, absurd, silly, preposterous, senseless or stupid. See *Southern Kansas State Lines Co. v. Public Service Commission,* 135 Kan. 657, 11 P.2d 982, 987 (1932); and *Urmston v. City of North College Hill,* 114 Ohio App. 213, 175 N.E.2d 203 (1961). In this jurisdiction it has been said that for an ordinance to be "unreasonable" it must be "immoderate in its terms." *Komen v. City of St. Louis,* 316 Mo. 9, 289 S.W. 838, 841 (1926), and in some cases the term has been equated to "arbitrary." *Michell's Inc. v. Nelms,* 454 S.W.2d 809 (Tex. Civ.App.1970); *Edelman v. F. W. Woolworth Co.,* 252 Ill.App. 142 (1929); *Cedarhurst Park Apartments, Inc. v. Milgrim,* 55 Misc.2d 118, 284 N.Y.S.2d 330 (1967).

Every case must be judged on its own particular facts. In this case the lease was for 12 years with three possible extensions of five years each or for a total of 27 years. During the time that A & P operated a supermarket in the premises only the base rental was paid, but it may be assumed that both A & P and plaintiff expected the volume of business to generate percentage rentals, or certainly that plaintiff expected that to happen or he would not have agreed to a base rent of $1,500.00 a month when the previous tenant had been paying $2,000.00 a month. Also, it may reasonably be assumed that A & P would exercise its option to extend the lease because it is renting the premises to H & K for almost

$900.00 a month more than it is paying plaintiff.[2]

We have found but one case which considers whether it is unreasonable for a lessor to refuse to consent to a sublease for the reason that the sublessee could not, or it was unlikely that it would, generate percentage rentals. In *Jones v. Andy Griffith Products, Inc.*, 35 N.C.App. 170, 241 S.E.2d 140, 143 (1978), the percentage lease was for a term of 20 years, with a minimum monthly rental of $1,488.50 or 6½% of annual gross sales if this resulted in more than the minimum. The building was adapted for the operation of a restaurant, and the lessor refused to give his consent to a sublessee who was in the business of radio and television sales and repair. In the opinion it was stated: "Unquestionably, [lessor's] motive was to enhance the potential for the percentage rentals contemplated in the Lease Agreement," and "Thus we come, in our analysis, to the question of whether [lessor's] desire to maintain a restaurant operation in the subject premises in light of the nature of the building and the desire for percentage rental constituted reasonable grounds for withholding consent to the proposed sublease * * *." The court affirmed the finding of the trial court that the lessor's "preference for a restaurant operation was reasonable due to the nature of the building and the expectations of a higher return on investment."

A & P and H & K cite and rely primarily on three cases in support of their contention that the inability of H & K to generate percentage rentals is an "unreasonable" standard upon which to withhold consent. The first is *Crestwood Plaza, Inc. v. Kroger Co.*, 520 S.W.2d 93, 97 (Mo.App.1974). In

that case there was no provision in the lease restricting the right of the lessee to sublease. This court held that absent provisions to the contrary, the lessee had an absolute right to sublet the premises, and it stated that "where there is a percentage lease and the lessee is required to pay both a substantial guaranteed minimum rent plus a percentage of the sales, it has been held that, in the absence of a provision forbidding subletting, subletting is not precluded even though a portion of the rent is computed on the basis of percentage of income." The issue of whether a consent to sublease was "unreasonably withheld" was not in that case.[3]

The second case is *Chanslor-Western Oil and Development Co. v. Metropolitan Sanitary District of Great Chicago*, 131 Ill. App.2d 527, 266 N.E.2d 405 (1970). The lease authorized the lessee to sublet upon written consent of the lessor "which consent shall not be unreasonably withheld." The Sanitary District adopted a "Rule" after the execution of the lease to the effect that it would not consent to any sublease until the rental was renegotiated. The court held that the terms of the lease could not be changed by a subsequently adopted "Rule," and since that was the only reason for the refusal to consent, the consent was "unreasonably withheld."

The third case is *Polk v. Gibson Products Co. of Hattiesburg, Inc.*, 257 So.2d 225 (Miss.1972). It was a suit in equity by the lessor to compel the lessee to remain in possession of the premises. The lease prohibited a sublease without the written consent which should not be unreasonably withheld. The lessee notified the lessor of

2. The term of the sublease is as follows: "The Sublessor hereby subleases to the Sublessee, and Sublessee hereby takes from the Sublessor, the premises above described * * * for the balance of the original term of said lease, less one day, * * * with three-five year options * * *."

3. There is authority that a percentage rental provision in a lease impliedly prohibits a sublease without the lessor's consent. See *Lippman v. Sears Roebuck & Co.*, 44 Cal.2d 136, 280 P.2d 775 (1955), and *Rowe v. Great*

*Atlantic & Pacific Tea Co., Inc.*, 61 A.D.2d 473, 402 N.Y.S.2d 593, 598 (1978). In the *Rowe* case it was said: "Since the landlord has agreed to gamble with his tenant on the latter's success, if the agreed minimum rent is not substantial, the landlord should not be compelled, over his vigorous objection, to gamble with another's business acumen. In all percentage leases, the identity of the tenant necessarily affects the landlord's determination of whether to share the risks of the tenant's business venture."

its intention to sublet the premises. Consent was refused, and it appears that the lessor demanded a guarantee of some or all of the percentage rental. The precise basis for the ruling is not clear, but the judgment of the trial court dismissing the petition was affirmed, apparently on the basis of deference to findings of the trial court. These three cases do not support the position of A & P and H & K on this appeal.

■ In this case the trial court entered judgment terminating the lease, thereby rejecting the contention of A & P and H & K that plaintiff had "unreasonably" withheld his consent to the sublease. The evidence clearly authorized a finding that the refusal to consent to the sublease was not arbitrary on the part of the lessor, but that it was a reasonable exercise of business judgment on his part. The judgment of the trial court is not against the weight of the evidence, and it is not the result of an erroneous declaration or application of the law. See Rule 73.01 and *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

In their second point A & P and H & K assert that the trial court erred in holding that lessor "did not waive his right to 'declare a forfeiture' as a matter of law." They assert that lessor (a) "waived his right to declare a forfeiture as a matter of law by accepting A & P's January, 1977, rental payment after the required notice of default was issued and his right of forfeiture was fixed, but before any act was taken to terminate the lease," and (b) lessor "waived his right to fix his right of forfeiture by accepting ten (10) rental checks from A & P, extracting an agreement from A & P to make certain disputed repairs and permitting H & K to go on the premises, undertake remodeling and open for business before issuing the notice of default as required by the lease even though he was aware of this lease requirement and knew of the subletting some ten (10) months earlier." They also assert that lessor was "either estopped or barred by laches" from declaring a forfeiture of the lease.

A brief review of the circumstances is appropriate. After A & P notified plaintiff that it was going to close the store located in the premises, A & P's representative advised plaintiff that it wanted to get out of the lease and would attempt to find another supermarket to occupy the store so that it could sell the fixtures. Unknown to plaintiff, A & P's representative contacted H & K concerning a sublease. Then on December 15, 1975, a meeting was held , and A & P's agent told plaintiff that he had "a non-food user who was interested." He did not tell plaintiff who it was or that the interested person was to be a sublessee. However, A & P had already negotiated a sublease with H & K, and H & K had already signed it. No request was made by A & P at this December meeting that plaintiff consent to a sublease. The sublease with H & K was signed by A & P on the following day, December 16. In the meantime plaintiff received rumors to the effect that a furniture store was to occupy the premises, and as a result he wrote the letter to A & P dated January 22, previously set forth, and received the reply dated February 10. For a lessor who was entitled to "reasonably" withhold his consent to a sublease, the above correspondence left much to speculation. The starting time and duration of the sublease was not disclosed, and there was no information concerning needed or intended alterations in the building. On March 2, 1976, plaintiff notified A & P that he would not consent to the sublease. At that time H & K had not taken possession of the premises, and although it is not clear from the record it appears that it did not open for business until June.

A & P wrote plaintiff on March 9 stating that if by March 19 the "necessary repairs to the building to provide possession and occupancy as required of you by our lease," have not been made, and if plaintiff had not "provided us with written approval for the Sublessee, Manor House Furniture," A & P would perform the repairs "and withhold the expenses incurred from future rent payments" and Manor House Furniture would be allowed to open for business.

On April 1, plaintiff replied that the necessary repairs had been completed, but that he "has not and will not accept the sublease to Manor House Furniture." Appar-

ently it was about this time that the refusal of plaintiff to consent to the sublease was conveyed to the sublessee and plaintiff received a letter, dated May 11, 1976, from H & K's attorney in which he stated that "Manor House Furniture * * * is presently the sublessee" of the premises, and that "until recently informed to the contrary," H & K "had been led to believe" by the representative of A & P that plaintiff had "agreed in writing to this sublease arrangement." Inquiry was made as to plaintiff's "position in this matter." Plaintiff replied on May 13, 1976 that "A & P has not obtained a written consent for *any* sub-leasing" of the premises, and that he would appreciate it if he would advise his client, H & K, "to vacate the property as soon as possible or at their earliest convenience." Subsequently, plaintiff and his attorney on several occasions met with or talked to Mr. McDermott, the "Group Director of Real Estate" for A & P. According to Mr. McDermott, plaintiff took the position that he "would want the store back and our subtenant out," or as an alternative he "would offer the building and the property for sale to A & P," while A & P's position was that it "had a subtenant to protect and [it] was willing to give our lease with out subtenant back to [plaintiff] if he was willing to accept it."

Provision was made in the lease that "if default shall be made in any of the covenants herein contained by the Lessee, the Lessor will notify the Lessee of such default in writing, * * * and unless such default be remedied within a period of thirty (30) days after giving such notice it shall be lawful for the Lessor to re-enter the said premises and to give have an enjoy the same * * *."

On November 22, 1976, plaintiff notified A & P in writing that the lease of the premises "shall terminate on December 31, 1976, and you are hereby notified and required to vacate the premises and surrender possession thereof * * * at or before that time and date, unless within thirty days of receipt of this notice you have terminated any sublease concerning the above described premises entered into by you as sublessor without the consent of the undersigned, and said sublessee is removed from the premises."

Subsequent to the time that plaintiff was notified by A & P that it had entered into a sublease with H & K, A & P tendered, and plaintiff accepted, monthly rent checks, each in the amount of $1,500, and plaintiff also accepted a rent check subsequent to the expiration of time, December 31, 1976, set forth in plaintiff's notice of forfeiture. Appellants assert that by the acceptance of these checks, plaintiff waived his right as a matter of law to declare a forfeiture.

■■■ Generally speaking, the acceptance by a landlord of rent which accrues after the breach of a condition contained in a lease implies a waiver of the right to declare a forfeiture of the lease for that breach, "unless there are circumstances arising from such acceptance of rent by him so as to negative the presumption of his affirmance of the continuance of the lease." 49 Am.Jur.2d Landlord and Tenant § 1067. This rule is based on the theory that the acceptance of rent amounts to a waiver of the known breach of the condition. But, "Waiver is the intentional relinquishment of a known right," *National Alfalfa Dehydrating and Milling Company v. 4010 Washington, Inc.*, 434 S.W.2d 757, 764 (Mo.App. 1968); *Commerce Trust Company v. Weed*, 318 S.W.2d 289 (Mo.1958), and the question of whether a waiver occurred is primarily an issue of intent. *Gary Realty Co. v. Kelly*, 278 Mo. 450, 214 S.W. 92 (1919); *Lewis v. Clothes Shack, Inc.*, 62 Misc.2d 767, 309 N.Y.S.2d 513 (1970); *Chertkof v. Southland Corporation*, 280 Md. 1, 371 A.2d 124 (Md. 1977). Although the intent of the lessor to waive a breach by the lessee of a convenant of the lease may be implied from the conduct of one of the parties, "it must clearly appear," *Conservative Federal Savings & Loan Association v. Warnecke*, 324 S.W.2d 471 (Mo.App.1959). As stated in *Schwab v. Brotherhood of American Yeomen*, 305 Mo. 148, 264 S.W. 690, 692 (1924), "To make out a case of implied waiver of a legal right, there must be a clear, unequivocal, and

decisive act of the party showing such purpose, or acts amounting to an estoppel on his part." Whether acceptance of rent after knowledge of a breach of a convenant by a tenant be considered as a rebuttable presumption, *Mobile Oil Corporation v. Burdo*, 69 Misc.2d 153, 329 N.Y.S.2d 742 (1972), or an inference of a waiver, *In re Wil-low Cafeterias*, 95 F.2d 306 (2d Cir. 1938), cert. den. 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533, "The important point to be made is that the acceptance of rent, even though it accrues after the breach of convenant, does not establish waiver as a matter of law." *Chertkof v. Southland Corporation*, supra 371 A.2d at p. 127. See also *Lucas Hunt Village Co. v. Klein*, 358 Mo. 1054, 218 S.W.2d 595 (banc 1949); *Wecht v. Anderson*, 84 Nev. 500, 444 P.2d 501 (1968). This is particularly true when, as in this case, there is an issue of fact as to the intent evidenced by all the circumstances.

█ In addition to the above, the lease in this case contained the following provision: "Nothing herein contained shall deny Lessor's privilege of waiving any default without thereby waiving his rights as to a subsequent default of the same or different subject matter. In the event of reentry or of termination of this lease due to Lessee's default, Lessee shall remain liable until the time when this lease would have expired, for the equivalent of the amount of all of the rent reserved herein, less the avails of reletting if any." One of the underlying reasons that the acceptance of rent after a known breach of covenant by the lessee constitutes a waiver of the right to declare a forfeiture is that such acceptance is inconsistent with the contention that the lease is terminated. But in this case, the lease specifically provided that A & P should continue to be liable for the rent after its breach and after re-entry by lessor because of that breach. A & P does not argue that its liability for rent was to be terminated after the lessor exercised his right of forfeiture. Therefore, the acceptance of rent after the breach by A & P and after the declaration by lessor of a forfeiture was not an act

inconsistent with lessor's position that by subletting the premises A & P forfeited its right to possession of the premises for the remainder of the term of the lease.

Although there are some cases which hold that a provision in a lease agreement similar to the one in this case does not prevent a waiver of a breach, *Miller v. Reidy*, 85 Cal. App. 757, 260 P. 358 (1927); *Batley v. Dewalt*, 50 Wash. 431, 105 P. 1029 (1909); *McKildoe's v. Darrocott*, 13 Grattan (Va) 278 (1856); *Condit v. Manischewitz*, 220 App.Div. 366, 221 N.Y.S. 371 (1927), the reason for the results reached appears to be that the facts and circumstances indicate a contrary intent. But in cases where the circumstances do not indicate an intent to waive a breach of the lease by the lessee, such a provision in a lease has been held to prevent a waiver of a breach of the lease on the basis that the lessor accepted rent payments. See *Hoffman Wall Paper Co. v. City of Hartford*, 144 Conn. 531, 159 A. 346 (1932); *Del Toro v. Juncos Central Co.*, 276 F. 894 (1st Cir. 1921); *Miller v. Prescott*, 163 Mass. 12, 39 N.E. 409 (1895); *Vintaloro v. Pappas*, 310 Ill. 115, 141 N.E. 377 (1923). As stated in *In re Wil-low Cafeterias*, supra at p. 309, the purpose of a clause in a lease providing that the receipt of rent with knowledge of a breach shall not be deemed a waiver as to a breach of a convenant in the lease "was to permit the lessor to accept payment of the amount stipulated in the lease as rent after forfeiture of the term."

█ Where the lessor maintains his position concerning a breach of the lease, and insists on his rights under the lease, as plaintiff did in this case, mere delay in declaring a forfeiture does not result in a waiver of that right. *Wilson v. Watt*, 327 S.W.2d 841, 851 (Mo.1959). Also, as stated in *Mobile Oil Corporation v. Burdo*, supra 329 N.Y.S.2d at p. 748 "a landlord's acceptance of rent while he negotiates with the tenant with respect to a violation of their lease does not, barring a proviso in the lease to the contrary, constitute a waiver of such breach." See also *Lewis v. Clothes Shack, Inc.*, supra.

In view of the position taken by lessor, the fact that after a declaration of forfeiture and even after re-entry A & P remained liable for the rent, and the total circumstances of this case, we conclude that in its determination that lessor did not waive his right to a forfeiture, the judgment of the trial court is not against the weight of the evidence, and it is not the result of an erroneous declaration or application of law. Rule 73.01.

 Appellants' contend that lessor also "extracted an agreement from A & P to make certain disputed repairs and permitted H & K to go on the premises, undertake remodeling and open for business before issuing the notice of default some ten months after learning of the subletting to H & K." This goes to the issue of estoppel.

We do not consider these conditions to be borne out by the evidence. As previously noted, it was not until after the sublease was executed that plaintiff learned about it and the identity of the sublessee. We do not find in the record when H & K started its remodeling, but on March 2, 1976 when plaintiff notified A & P that he would not consent to the sublease H & K had not then moved into the premises. It was not until May that H & K learned that prior representations to it by A & P that plaintiff had consented to the sublease were not correct. We find nothing in the testimony to support the assertion that plaintiff "extracted" an agreement from A & P or "permitted" H & K to remodel the building and make repairs. Plaintiff made it perfectly plain to A & P that he would not consent to the sublease, and there is nothing to indicate that A & P or H & K ever took any action to the detriment of either as the result of representations of the lessor. See *National Alfalfa Dehydrating and Milling Company v. 4010 Washington, Inc.*, supra.

Appellants' fourth point is that the trial court "erred in not granting A & P's motion for summary judgment." In this court tried case this point is disposed of by our ruling on the previous points.

Appellants' last point is that the trial court "committed reversible error" by "ad-mitting certain testimony from Mr Haack [lessor], Jerome Mandelstamm and/or Clarence Turley, Jr., in violation of the rules of evidence and Missouri Bar Disciplinary Rule 5–102A, since Mr. Haack's testimony concerned settlement negotiations with A & P; Mr. Mandelstamm's testimony related to a disputed point yet he was a member of plaintiff's counsel's law firm and an attorney of record; and Mr. Turley's testimony involved inadmissible opinion evidence for which no foundation was laid and insufficient facts were available to support."

As stated in *Menos v. Hodges*, 499 S.W.2d 427, 429 (Mo.1973), " 'Prejudicial error' or 'reversible error' in the admission or rejection of evidence is not an issue on an appeal in a case tried before the court. The issue is whether the evidence should have been admitted and considered, or rejected and not considered, and when that issue is determined the next issue is what the judgment of this court should be, based upon a consideration of the competent and admissible evidence." See also *Martin v. Norton*, 497 S.W.2d 164 (Mo.1973).

 *The testimony of the lessor, Mr. Haack*: When this witness was testifying on direct examination, counsel for A & P commented that plaintiff "intends to go into certain discussions that occurred with a Mr. McDermott of A & P." Objection was made to such testimony because "these were negotiations incident to resolving of an existing dispute between the parties." Counsel for plaintiff responded that A & P "is attempting to use as affirmative defenses propositions of waiver and laches." and the purpose was to show "they were actively negotiating up until the time they [lessor] gave notice of termination." The court overruled the objection, but it ruled that "going into the details of them [the negotiations] will be improper." The fact that continuing negotiations were held was material and relevant to the issue of waiver by reason of accepting rent payments after knowledge of the breach of the lease by A & P and the delay in serving notice of termination. See *Mobile Oil Corporation v. Burdo*, supra.

**The testimony of Mr. Mandelstamm**: After lessor testified that negotiations had taken place with A & P after he learned of the sublease, plaintiff called as a witness Mr. Jerome R. Mandelstamm, a member of the law firm to which plaintiff's attorney belonged. A & P objected and stated that "this would require the disqualification of the Plaintiff's law firm" as counsel for plaintiff. Plaintiff stated to the court that the purpose was to "clarify and testify as to the last date on which he continued his negotiations with A & P." A & P then stated that "the nature of the testimony * * * would violate * * * Disciplinary Rule 5–102." The objection was overruled. Mr. Mandelstamm then testified he had negotiations with A & P, that "we first met with Mr. McDermott * * in June of 1976," and that negotiations continued "until the first week in October of 1976."

Disciplinary Rule 5–102A places certain limitations on when a lawyer or member of his firm may testify in a case, but those limitations are subject to the provision in Disciplinary Rule 5–101(B) that "he or a lawyer in his firm may testify: * * * (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case." Appellants assert that the "trial court should not have permitted Mr. Madelstamm to testify without disqualifying his law from representing Mr. Haack."

The testimony was cumulative, and appellants do not challenge the accuracy of his testimony. In fact, they admit negotiations occurred; the two dates were the only things added by Mr. Mandelstamm. Under these circumstances there was no abuse of discretion on the part of the trial court in permitting the testimony of Mr. Mandelstramm without disqualifying his law firm from representing Mr. Haack through the remainder of the trial.

**The testimony of Mr. Turley**: When Mr. Turley was first offered as a witness by plaintiff, appellants stipulated "to Mr. Turley's qualifications in the real estate business and his qualifications as an expert."

Mr. Turley was asked if, in his opinion, "would reasonable real estate and commercial practices permit Mr. Haack as landlord to consent to the sublease of this lease * * to a furniture store under the same terms as are set out in the prime lease." An objection was sustained, and plaintiff's counsel then stated: "Mr. Turley, if I added to that question, a furniture store with projected estimated annual sales of between $400,00 and $750,000 then can you answer the question?" Mr. Turley answered that "The prudent owner would not." Counsel for A & P then said: "let me make an objection before the witness gives his testimony, for the reason I still don't think there has been sufficient facts put in evidence, or sufficient facts put in the hypothetical upon which this witness could base his opinion, and the question is still too broad." Counsel for plaintiff then stated that "evidence has not been put in as yet, which is available and will come in into the projected sales of this particular store." The court overruled the objection with the comment that "by agreement we have taken this witness out of turn."

While we do not recommend this procedure, appellants do not contend that the record as a whole does not supply the proper foundation for the question, and we consider the question to call for an answer within the stipulated qualification of the witness. Also, we are not unmindful that "a trial court, sitting without a jury, may properly allow wide latitude in the admission of evidence because the trial judge is presumed to not to give weight to incompetent evidence." *Spielberg Mfg. Co. v. Direct Sales Intern., Inc.*, 566 S.W.2d 839, 940 (Mo.App.1978).

The judgment is affirmed.

SMITH, P. J., and STAZ, J., concur.