[No. H005680. Sixth Dist. May 26, 1989.]

PAY 'N PAK STORES, INC., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
RICHARD MILLER et al., Real Parties in Interest.

COUNSEL

Barbara J. Frischholz and Robinson & Wood for Petitioner.

No appearance for Respondent.

Harold M. Jaffe for Real Parties in Interest.

OPINION

PREMO, Acting P. J.—In this lawsuit for breach of contract in connection with a lease of commercial property, defendant and petitioner Pay 'N Pak Stores, Inc. (hereinafter, Pay 'N Pak) seeks statutory mandate review (Code Civ. Proc., § 437c, subd. (*l*)) of a partial summary adjudication. Real parties in interest, Richard and Patricia Miller, are the plaintiffs and former tenants in a shopping center of which Pay 'N Pak is the present landlord. The trial court granted summary adjudication to the effect that Pay 'N Pak had no legal right to refuse the Millers' requests to sublease to three potential tenants. Pay 'N Pak denied being approached as to one tenant, and as to the other two, contended it was entitled to refuse to consent to either sublease because each prospective tenant operated a competing business.

The relevant facts are undisputed except on the question whether the Millers approached Pay 'N Pak as to one of the three prospective tenants. The Millers entered into a written lease agreement with the predecessor of Pay 'N Pak, Bonanza Building Centers, Inc. (hereinafter, Bonanza), on December 4, 1981, authorizing the Millers to operate a business called Baby Wear Outlet on the premises of a shopping center on Blossom Hill Road in San Jose. The lease was for a period of 10 years with an option to renew for an additional 10 years, and provided by addendum that the tenant would have the complete right to sublet or assign during the first 6 years of the

lease. In early 1983, Bonanza assigned the lease to Pay 'N Pak. Pay 'N Pak operates a home improvements store in the subject shopping center.

In the spring of 1986, the Millers informed Pay 'N Pak that they were going out of business. They claim to have requested permission to lease to these three businesses: The Fan Factory, Inc.; Steve Adair/Inside Out; and Cal-X Spas. Pay 'N Pak admitted being approached with respect to the first two but denied any requests as to Cal-X Spas. With regard to the former two prospects, Pay 'N Pak denied permission to sublease to either because each sold products which Pay 'N Pak also sells. Ultimately the Millers obtained permission to sublease to a dry cleaning establishment. They then filed this lawsuit against Pay 'N Pak for breach of contract, breach of covenant of good faith and fair dealing, negligence, and infliction of emotional distress. They seek actual damages for lost rentals and allied expenses in the amount of $31,320.80, plus punitive damages of $1 million, costs and attorneys' fees.

Two provisions of the lease between Bonanza and the Millers are relevant here. The provision governing assignment and subletting provided that "Tenant . . . shall not sublet . . . without first obtaining the written consent of Landlord which consent shall not be unreasonably withheld." The provision governing use of the premises provided that "Tenant shall use the Premises for sale of children's apparel, furniture and accessories and for and [sic] office and shall not use or permit the Premises to be used for any other purpose without the prior written consent of Landlord."

Declarations in support of the Millers' motion for summary adjudication represented that Pay 'N Pak refused consent to lease to Steve Adair doing business as Inside Out, because that business sold fireplace inserts which Pay 'N Pak also sold. Pay 'N Pak refused permission to sublease to the Fan Factory because it sold ceiling fans, lighting fixtures, and related items which were also sold by Pay 'N Pak at its Blossom Hill store. The Millers presented written correspondence evidencing these facts. Regarding Cal-X Spas, they presented only the declaration of their son-in-law Mike Zamani, who negotiated for them, that he requested consent to sublease to that entity on the telephone from Peter Gallina, vice president for real estate for Pay 'N Pak, and was referred to Doug Southern, senior vice president for finance, who would not consent because Pay 'N Pak had sold spas in the past and might do so again. However, in declarations and in deposition testimony, Pay 'N Pak denied any knowledge of a request concerning this subtenant. Southern's declaration states that he recalls only two sublease proposals, that of the Fan Factory and one other business that sold hot tubs

and wood burning stoves, whose name he does not remember. He does not recall any proposal as to a business selling only spas, such as Cal-X Spas.

The Millers proffered an attorney declaration showing the following figures, supported by evidence elicited during discovery: Pay 'N Pak had total sales for its Blossom Hill store for the fiscal year ending February 28, 1986, of $4,409,011.95, and for the following year, $4,087,577.42; its total sales of flue parts, stoves, fireplace accessories, chimney kits and actual fireplaces for May 1985, through April 1986, consisted of $15,456.38 of merchandise at retail and $7,690.13 merchandise at a sale price for total sales of $23,146.51; and its total sales of fans, fan lights, accessories and ceiling fans for the period May 1, 1985 through April 30, 1986, was $39,330. From this data, the Millers argued that sales of these items were not a significant part of Pay 'N Pak's business. However, Pay 'N Pak responded both in argument and in Southern's declaration that the percentage of sales is not the only relevant fact to show the importance to Pay 'N Pak of competition in these items; that sales of ceiling fans and associated light fixture items are a significant profit item for Pay 'N Pak; that these items are an important product line and contribute to the store's image; that the fans are in particular a significant advertising item, they figure prominently in Pay 'N Pak's newspaper advertisements and draw customers into the store who may then purchase other items; that related items include light bulbs, electrical wiring, and switch boxes; and that the same is true of wood stoves and fireplaces, which are seasonal sales items with significance in their ability to draw customers into the store in the fall and winter months.

The trial court made an order finding the following issue to be without substantial controversy: Pay 'N Pak had no legal right to refuse to consent to the requests by the Millers to sublease to the Fan Factory, Inc., to Steve Adair/Inside Out, or to Cal-X Spas, respectively.

## DISCUSSION

■ We disagree with the trial court's determination granting summary judgment. First, summary adjudication was inappropriate as to the landlord's right to refuse consent to sublease to Cal-X Spas because the declarations plainly presented a factual dispute over whether consent was ever requested of Pay 'N Pak regarding this prospective tenant.

■ Secondly, the summary adjudication cannot rest on any comparison of the volume of similar products sold by Pay 'N Pak and by the prospective tenants. Such a comparison raises factual issues rendering summary

adjudication inappropriate. This record presents disputed questions whether Pay 'N Pak acted in a commercially reasonable manner when it rejected these tenants as potentially significant competitors. Obviously, as stated in the Southern declaration, there is more to competition than simple diversion of sales; there are factors such as the ability of a product line to draw customers into the store and the availability of supporting lines of products and accessories which might generate additional sales. Therefore summary adjudication cannot rest on the sales figures provided by the Millers.

■ This leaves as a basis for the ruling only the proposition that as a matter of law Pay 'N Pak could not refuse consent to a sublease when its only objection was the operation of a competing business. The Millers here rely primarily on the decision in *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837]. That case posed the issue whether, in the absence of a lease provision that the landlord's consent to sublease will not be unreasonably withheld, a landlord may unreasonably withhold consent to an assignment. (*Id.* at p. 492.) The court held that the landlord could not do so. The decision relied on (1) principles of contract law which require good faith on the part of contracting parties, and (2) common law aversion to unreasonable restraints on alienation. (*Id.* at pp. 494, 497-501; see also *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 948 [148 Cal.Rptr. 379, 582 P.2d 970] [regarding restraints on alienation].)

*Kendall* did not address the issue whether a refusal to lease to a competing business is unreasonable per se. In maintaining that the case stands for that proposition, the Millers misinterpret language in *Kendall* saying that the purpose of a lease clause restricting the right of sublease or assignment is not for the landlord's general economic protection, but rather is to protect the landlord in its ownership and operation of the particular property. (*Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d at p. 501.) This language, in our opinion, does not say that protection from competition is a forbidden "general economic protection."

To begin with, the facts in *Kendall* did not involve a refusal to sublease based on competition, nor did the cases it discusses and relies on involve such facts. Most involved situations where the rental value of the property had increased beyond that provided for in the lease and the landlord tried to take advantage of the fortuity of the sublease to exact an increased rental. This is the "general economic benefit" which the *Kendall* court plainly had in mind as a perceived unfair and unreasonable behavior on the part of the landlord. Many decisions, which are cited in *Kendall,* similarly condemn

such tactics, including the decision from which *Kendall* quotes in stating that the lease is not for the landlord's general economic protection. (*Ringwood Associates* v. *Jack's of Route 23* (1977) 153 N.J. Super. 294 [379 A.2d 508, 512.]) *Kendall* plainly says the objectionable practice is the landlord's using the occasion of a sublease as an opportunity to get a greater benefit than it was hitherto entitled to under the lease. (*Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d at p. 504 ["Respondent here is trying to get *more* than it bargained for in the lease."]; see also *Schweiso* v. *Williams* (1984) 150 Cal.App.3d 883 [198 Cal.Rptr. 238] [transfer fee for subletting referred to as "blood money"].)

But *Kendall* does *not* say anything about the fairness of insisting that the lease go only to a noncompeting business. Those were not the facts in *Kendall* and that issue was not considered.

Instead, language in *Kendall* could arguably be interpreted as protecting the landlord in his assertion of a right not to lease to a competitor. ▪ The decision says that although a refusal for "general economic benefit" is proscribed, the landlord may protect himself in his ownership and operation of the particular property. (*Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d at p. 501.) The decision says that a legitimate reason for a landlord to prevent subletting of the premises is "to protect the lessor's interest in the preservation of the property and the performance of the lease covenants." (*Ibid.*) It is reasonable to argue that protection from competition which diminishes the landlord's business is not general economic protection but is specific protection in his ownership of the particular property.

That is particularly true here where the subleased property is in the same shopping center where the landlord has his business and the landlord might have validly included a restricted use clause in the lease for the very purpose of protecting the business interests of other tenants in the shopping center. ▪ Reasonable use restrictions are valid and enforceable. (*Chandler* v. *Hart* (1911) 161 Cal. 405, 413 [119 P. 516]; *Stockton Dry Goods Co.* v. *Girsh* (1951) 36 Cal.2d 677, 680 [227 P.2d 1, 22 A.L.R.2d 1460].) Further, Pay 'N Pak's refusal to consent to these competing subleases could, within the *Kendall* decision, be regarded as a reasonable attempt to insure performance of the lease covenants, such as the restriction on use of the premises.

The lease here restricted use of the leased property to baby items or office use—a business which does not compete with Pay 'N Pak. It follows that Pay 'N Pak gets no "increased" or "general economic" benefit by preventing sublease to a competing business. Rather, by refusing to sublease to a

competitor it maintains what it was already entitled to under the master lease. In withholding consent, not only is it not acting unreasonably as a matter of law, but also, it is invoking specific protection which is a bargained-for term of the lease, namely, the right to restrict uses of part of the property. *Kendall* does not prohibit that course of conduct.

Pay 'N Pak admits it did not hold the Millers strictly to the terms of the use restriction limiting the use of the subleased property to baby wear or office use. It was thus willing not to stand on its rights where those rights were not of economic significance. But its willingness to waive some of the protection the lease afforded should not make it automatically bereft of all the bargained-for protection. It properly maintained that by virtue of the right to reasonably withhold consent, combined with the right to restrict the property to existing uses, it could deny consent to competitors which would hurt its business and put it in a worse position than it originally enjoyed. Nothing in *Kendall* says that its course of conduct here was either unreasonable as a matter of law or legally proscribed.

■ The Millers argue that California courts narrowly construe covenants not to compete and will not imply such covenants in leases where they are absent. (*Stockton Dry Goods Co.* v. *Girsh, supra,* 36 Cal.2d 677; *Carr* v. *King* (1914) 24 Cal.App. 713 [142 P. 131]; 4 Miller & Starr, Current Law of Cal. Real Estate (1977) § 27:41, p. 288.) That proposition conceded, it nevertheless remains true that the landlord here did not necessarily act unreasonably in refusing to consent to a sublease to a competitor. If his behavior was reasonable, than he was acting within his express powers under the lease, (1) to withhold consent reasonably, and (2) to restrict the premises to the existing use. It is not necessary to imply a covenant against competition in this lease in order to decide that Pay 'N Pak could refuse its consent to these subleases. It is necessary only to measure its express powers under the lease, an issue turning on the factual question of reasonableness under the circumstances. That issue is for the trier of fact.

### DISPOSITION

Real parties in interest have been notified that a peremptory writ in the first instance could be issued here, and have filed opposition. The peremptory writ of mandate will issue in the first instance. (Code Civ. Proc., § 1088; *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-182 [203 Cal.Rptr. 626, 681 P.2d 893].)

Let a writ of mandate issue as prayed, directing respondent court to enter an order denying real parties' motion for summary adjudication of issues. As the prevailing party, Pay 'N Pak shall have costs in this matter.

Cottle, J., and Elia, J., concurred.