RAQUEL H. NEWMAN, TRUSTEE OF THE CALVIN M. NEWMAN AND RAQUEL H. NEWMAN CHARITABLE TRUST, APPELLANT, V. HINKY DINKY OMAHA-LINCOLN, INC., A NEBRASKA CORPORATION, APPELLEE.

512 N.W.2d 410

Filed February 15, 1994.    No. A-92-346.

Jeffrey A. Silver for appellant.

Kurt F. Tjaden, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

CONNOLLY, HANNON, and WRIGHT, Judges.

CONNOLLY, Judge.

This appeal arises from the dismissal of a forcible entry and detainer action filed by the appellant, Raquel H. Newman, trustee of the Calvin M. Newman and Raquel H. Newman Charitable Trust (Newman), against the appellee, Hinky Dinky Omaha-Lincoln, Inc. (Hinky Dinky). Newman originally leased the premises at issue to a Texas-based supermarket operator. That party assigned its interest in the lease to another party, who then sublet the premises to Hinky Dinky. The assignment and sublease were executed without the consent of Newman despite a provision in the lease prohibiting assignment or sublease without Newman's consent. Newman did not want Hinky Dinky as a tenant and sought to remove Hinky Dinky from the premises on grounds that no valid right to possess the premises had been transferred to Hinky Dinky.

Hinky Dinky responded to Newman's forcible entry and detainer action by claiming that Newman had been unreasonable in refusing to consent to the transactions that resulted in Hinky Dinky's tenancy. Hinky Dinky argued that Newman waived or negated the consent provision in the lease by acting unreasonably and in bad faith in withholding consent to the assignment and sublease. On the issue of consent, Newman moved for summary judgment on grounds that a landlord's right to withhold consent to an assignment or a sublease is unconditional. The trial court agreed and granted summary judgment for Newman on that issue. On appeal, the Nebraska Supreme Court reversed, holding that a landlord's refusal to consent to an assignment or a sublease will be given effect only if the refusal is reasonable and in good faith. See *Newman v. Hinky Dinky*, 229 Neb. 382, 427 N.W.2d 50 (1988) (*Newman I*). The cause was remanded to the trial court for resolution of the question of whether Newman had been reasonable in withholding consent to the transactions at issue.

On remand, the trial court found that Newman had been unreasonable in refusing to consent. Newman's cause of action was dismissed. Newman appeals that judgment. We reverse the judgment and remand the cause for a new trial because the trial court erred in assigning to Newman the burden of proof on the issue of whether her refusal to consent was reasonable.

## I. FACTS

We base our factual review on the narrative set out in *Newman I*, with augmentation where appropriate.

### 1. PERCENTAGE LEASE

Newman owns the real estate at issue, which is located at 59th and Adams Streets in Lincoln. The leasehold at issue dates back to June 14, 1961, when Adams Fifty-Nine Corporation leased the premises to The Sixtieth & Adams Company, Inc. The lease was renegotiated in 1977. At that time, Newman was the successor in interest to Adams Fifty-Nine. The successor in interest to Sixtieth & Adams was the American Community Stores Corporation (ACS), a Texas-based corporation that operated a supermarket on the premises.

Prior to the renegotiation of the lease, ACS wanted to expand the store. To that end, ACS arranged to borrow $400,000 from Newman's charitable trust. By law, Newman could not loan the necessary capital to ACS, so the transaction was financed through a new written lease of the premises executed on July 1, 1977. The 1977 lease refers to Newman as the "landlord" and to ACS as the "tenant." The fixed annual rent was set at $27,999.96. In addition, ACS was obligated to pay percentage rent in the amount of $1^{1}/_{2}$ percent of annual gross receipts up to $7.4 million, and 2 percent of annual gross receipts over $7.4 million. Newman had insisted on the percentage rent provision so that the trust would be able to recover a fair return on its $400,000 investment in ACS' expansion. In order to protect the trust's interest in the investment and ensure a fair return via percentage rent, language was inserted in the lease stating that "the business operations on the Leased Premises shall at all times be consistent with the operation of a first-class supermarket and consistent with maximizing the gross receipts from operations." As a further safeguard of the trust's interest, § 10.1 of the lease provides: "Tenant may not assign or transfer this Lease voluntarily or by operation of law or sublet the Leased Premises or any portion thereof without the written consent of Landlord first had and obtained." This provision allowed Newman to prevent the transfer of the property to an assignee or sublessee

unable to generate gross receipts sufficient to produce a level of percentage rent that would guarantee a fair return on Newman's $400,000 investment. At the expiration of the primary term of the lease in August 1981, ACS had the option of extending the lease for eight successive 3-year terms.

Newman's income from fixed rent and percentage rent went from approximately $78,000 in the first year of the lease to $97,664 in 1984. When we subtract the fixed annual rent of $27,999.96 from the total rent, we observe that by 1984 roughly 70 percent of Newman's income on the lease was coming from percentage rent on gross receipts.

## 2. REFUSAL TO CONSENT

Before ceasing operations of its Hinky Dinky grocery store chain on February 16, 1985, ACS asked Newman's consent for a proposed lease assignment to Nash Finch Company, and a subsequent sublease by Nash Finch to Hinky Dinky. Newman refused to consent to the transactions. Initially, Newman stood on what she believed to be an unconditional right to refuse consent. Later in February, ACS' lease assignment to Nash Finch and the sublease to Hinky Dinky were executed without Newman's consent.

On March 1, 1985, Newman notified ACS, Nash Finch, and Hinky Dinky, which then occupied the premises, that ACS was in default under the lease as the result of the assignment and subletting without Newman's consent. On March 4, Newman served a "Notice to Vacate Premises" upon those entities. Newman accepted rental payments from Nash Finch during negotiations to resolve the conflict concerning the propriety and efficacy of the assignment and sublease.

Over the course of the negotiations, Hinky Dinky provided Newman with information on its plans to reduce labor and overhead expenses while simultaneously lowering consumer prices. Apparently, Hinky Dinky also provided Newman with copies of financial reports and statements, as well as dossiers on the people who would be managing the store. According to the parties, ACS had a net worth of $100 million and Hinky Dinky had a net worth of between $200,000 and $210,000.

Aside from the fact that the assignment and sublease had

already been executed in breach of the lease, Newman's fundamental concern was that, regardless of the professional qualifications of the managers of Hinky Dinky and their plans to improve the efficiency of the store, Hinky Dinky appeared to be intent on maximizing profits even if that meant a reduction in gross receipts. Newman was willing to consent to the assignment and sublease if the other parties to the negotiations would agree to renegotiate the lease so that the percentage rent provision would be abolished and the fixed annual rent would be set at $97,000, thereby guaranteeing that Newman's income on the lease would not drop below the 1984 level. The proposal was rejected.

### 3. PROCEEDINGS CULMINATING IN *NEWMAN I*

Negotiations reached an impasse. Newman served a "Notice to Quit" on Hinky Dinky and filed a petition for restitution of the premises on August 22, 1985. Hinky Dinky answered that Newman had unreasonably withheld consent in violation of Nebraska law. Newman moved for summary judgment on the issue of consent. The motion was granted. The trial court ruled that there was no genuine issue of material fact concerning Newman's refusal to consent because, as a matter of law, a landlord may withhold consent for any reason.

The Nebraska Supreme Court reversed that judgment in *Newman I*, holding that

> where a commercial lease does not expressly permit a lessor to withhold consent to an assignment or subletting and contains an approval clause, such as a provision that there can be no assignment of the lease or subletting without the lessor's prior consent, a lessor may withhold consent only when the lessor has a good faith and reasonable objection to assignment of the lease or subletting, even in the absence of a lease provision that the lessor's consent will not be unreasonably withheld.

229 Neb. at 389, 427 N.W.2d at 55. The court found that whether Newman had acted in good faith in withholding consent was a question of material fact. Therefore, the cause was remanded to the trial court for further proceedings.

## 4. PROCEEDINGS ON REMAND FROM *NEWMAN I*

On remand, the trial court heard argument from both parties on the question of which party should bear the burden of proof on the issue of Newman's alleged unreasonableness. Newman argued that Hinky Dinky should be assigned the burden of proving that Newman had acted unreasonably in withholding consent to the proposed transactions, while Hinky Dinky argued that Newman should be assigned the burden of proving that she had acted reasonably. The court assigned the burden of proof to Newman.

A Newman representative attempted to testify that Newman's income on the lease was $81,315.27 in 1986, $83,295.09 in 1987, $67,549.69 in 1988, $53,721.93 in 1989, $43,339.91 in 1990, and $41,000 in 1991. Hinky Dinky objected. Newman made an offer of proof. The trial court sustained Hinky Dinky's objection and refused to admit the income figures into evidence.

Upon completion of the proceedings on remand, the trial court found that (1) regardless of which party had the burden of proof, the evidence clearly indicated that Newman's refusal to consent was not done in good faith on commercially reasonable grounds; (2) Newman had breached the lease by acting arbitrarily, unreasonably, and in bad faith in denying consent; and (3) Newman was estopped from arguing the good faith and reasonableness of her refusal to consent because, originally, Newman had proceeded on the theory that the right to withhold consent was unconditional. Given these findings, the trial court found it unnecessary to address the issue of whether Newman had waived her rights under the lease by accepting rent payments subsequent to the assignment and sublease. Newman's request for an order for restitution and damages was denied, and her petition was dismissed.

## II. ASSIGNMENTS OF ERROR

Newman argues that the trial court erred (1) in failing to find that the assignment and sublease were ineffective as a matter of law and that, consequently, Hinky Dinky has no standing; (2) in finding that Newman was estopped from arguing that her refusal to consent was reasonable and in good faith; (3) in

assigning to Newman the burden of proving that her refusal to consent was reasonable and in good faith; (4) in refusing to admit into evidence Newman's annual income on the lease from 1986 through 1991; and (5) in finding that Newman acted arbitrarily, unreasonably, and in bad faith in refusing to consent.

## III. STANDARD OF REVIEW

In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong. *Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 481 N.W.2d 416 (1992).

Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court. *Nebraska Builders Prod. Co. v. Industrial Erectors*, 239 Neb. 744, 478 N.W.2d 257 (1992).

## IV. ANALYSIS

### 1. Hinky Dinky's Standing

Newman argues that Hinky Dinky has no rights under the lease and, therefore, has no standing to contest this case. Newman points out that, pursuant to the terms of the lease, the transactions at issue were invalid because they were executed without Newman's consent. Consequently, according to Newman, no rights under the lease passed from ACS to Nash Finch, and from Nash Finch to Hinky Dinky. However, we do not know whether the transactions were valid and whether rights passed from ACS to Nash Finch to Hinky Dinky until we resolve the issue of Newman's alleged unreasonableness in refusing to consent to the transactions. Since the issue before us is whether Newman unreasonably withheld consent to the assignment and sublease, we find that under the facts of this case Hinky Dinky has standing.

### 2. Estoppel

In its order of judgment of March 25, 1992, the trial court adopted, almost verbatim, the proposed findings of fact and conclusions of law submitted to the court on March 16 by Hinky Dinky. The trial court gave the impression that it did not give meaningful consideration to Newman's arguments

concerning reasonableness and good faith because the court believed that Newman was estopped from making such arguments by virtue of her original position, taken before *Newman I*, that her refusal to consent did not have to be reasonable. We fail to understand how Newman waived the right to argue reasonableness on the merits by adopting what seemed to be the simplest approach to the issue when the cause of action was filed. Newman never conceded that she was unreasonable in refusing to consent. Newman simply argued, *and the trial court agreed*, that the issue of reasonableness was moot because the landlord's right to withhold consent was unconditional. See *Newman I*. New law was made in Nebraska when the Supreme Court ruled in *Newman I* that a lessor must act reasonably and in good faith in withholding consent to a proposed assignment or sublease, and the cause was remanded to the trial court so that the parties could address the issue on the merits. Therefore, Newman was not estopped from arguing reasonableness on the merits, and the trial court erred to the extent that it ignored Newman's argument on the merits on the issue of her reasonableness in withholding consent.

### 3. BURDEN OF PROOF

The record is somewhat confusing on this issue. The trial court found that Newman was estopped from arguing the merits on the issue of whether her refusal to consent was reasonable, yet the trial court assigned to Newman the burden of proving that she acted reasonably in withholding consent.

■ We find nothing in *Newman I* to support the trial court's view that "it's implied in [*Newman I*] that the burden is on the lessor in this kind of a case." Newman alleged that the lease had been breached because an assignment and a sublease had been executed without Newman's prior consent. Hinky Dinky responded by pleading an affirmative defense. Hinky Dinky argued that although the assignment and sublease had been executed without Newman's prior consent, Newman had breached the lease by unreasonably withholding her retroactive consent to the transactions. "The burden of both pleading *and proving* affirmative defenses is upon the defendants . . . ." (Emphasis supplied.) *First Nat. Bank v. Benedict Consol.*

*Indus.*, 224 Neb. 860, 865, 402 N.W.2d 259, 262 (1987).

In our analysis of this issue, we also rely on the reasoning of the Missouri Court of Appeals in *Haack v. Great Atlantic & Pac. Tea Co.*, 603 S.W.2d 645 (Mo. App. 1980). In *Haack*, a lessee who had breached a percentage lease by executing a sublease without the prior consent of the lessor argued that the lessor had been unreasonable in refusing to give the transaction his retroactive consent. The lessor had refused to consent on grounds that the proposed sublessee would not be able to generate enough sales volume to produce the percentage rent anticipated in the lease. The Missouri Court of Appeals stated that a lessee who breaches a percentage lease by subleasing without the consent of the lessor bears the burden of proving that the lessor was unreasonable in withholding his retroactive consent to the transaction.

Adopting that same rationale, and relying on the rule in *First Nat. Bank* that the defendant bears the burden of proving an affirmative defense, we find that the trial court erred in assigning to Newman the burden of proving that her refusal to consent was reasonable.

### 4. NEWMAN'S RENTAL INCOME FROM 1986 THROUGH 1991

We do not address this assignment of error because Newman's rental income from 1986 through 1991 is irrelevant to the question of whether Newman was reasonable in withholding consent in 1985. Newman wanted the income figures admitted into evidence because they indicated that Newman's income from percentage rent had dropped from approximately $70,000 in 1984 to $13,000 in 1991, an 81-percent decrease that seemed to vindicate Newman's concern that Hinky Dinky would not be able to generate gross receipts sufficient to sustain the 1984 level of percentage rent. However, the question of Newman's reasonableness is not governed retroactively by subsequent percentage rent figures. A sharp *increase* in percentage rent after 1985 would not necessarily mean that Newman's concern about percentage rent was unreasonable in 1985. Newman was not retroactively reasonable or unreasonable. Either Newman was reasonable during the negotiations in 1985 or she was not, regardless of

whether, after 1985, Hinky Dinky tripled its gross receipts or went out of business.

### 5. NEWMAN ACTED REASONABLY

For several months after declaring that the lease was in default, Newman continued to negotiate a retroactive consent to the transactions at issue, even though Newman believed that she was under no obligation to do so. Nonetheless, Hinky Dinky argues that Newman acted unreasonably and in bad faith in refusing to give retroactive consent to the assignment and sublease.

In *Newman I*, the Supreme Court stated that

> [f]actors to be considered in determining whether a lessor has acted with good faith and reasonably in withholding consent to an assignment of a commercial lease or subletting include: financial responsibility of the proposed assignee or sublessee; the assignee's or sublessee's suitability for the particular property; legality of the proposed use; need for alteration of the premises; and the nature of the occupancy. [Citation omitted.] Pertinent to an assignee's or sublessee's financial responsibility under the lease may be past revenue received by the assignee or sublessee and, insofar as demonstrable or ascertainable, prospective receipts in relation to rent based on gross receipts from the business conducted or to be conducted on the leased premises.

229 Neb. at 388, 427 N.W.2d at 54.

Most helpful to our analysis in this appeal is *Rowe v. A & P Tea Co.*, 61 A.D.2d 473, 402 N.Y.S.2d 593 (1978), *rev'd* 46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d 827. The case involved a percentage lease that was silent on the matter of assignability. The lower court ruled that a covenant against unilateral assignment without the consent of the lessor must be implied where a percentage lease is concerned. The higher court reversed that ruling, but each court's discussion of the nature of a percentage lease is instructive for purposes of the case now before us.

In *Rowe*, the lessee, The Great Atlantic & Pacific Tea Company (A & P), was a large supermarket operator similar to

ACS. To accommodate A & P's desire to expand its store and still keep fixed rent at a minimum, Rowe, the lessor, entered into a percentage lease in which Rowe's rental income consisted of fixed annual rent of $34,420 and percentage rent of $1\frac{1}{2}$ percent on annual sales between $2,294,666 and $5 million. The lower court stated that Rowe had agreed to the percentage lease because of his confidence in A & P as a major supermarket operator that would be able to generate a level of sales sufficient to produce significant percentage rent. The lower court also placed great emphasis on the fact that the realization of percentage rent was a crucial component of the lease agreement. Percentage rent was not a bonus or an afterthought. The lower court believed that Rowe would not have agreed to a fixed annual rent of $34,420 for 15 years, with three 7-year renewal options, if not for the provision guaranteeing him a $1\frac{1}{2}$-percent share of annual gross receipts from the range stated above. That was why Rowe objected when A & P assigned its interest in the lease; he did not believe that the assignee was in the same class with A & P as a major supermarket operator capable of generating the gross receipts necessary to provide percentage rent pursuant to the terms of the lease.

The New York Court of Appeals reversed the lower court's ruling for the following reasons:

> [T]he landlord is provided with an annual rental of some $34,420 in addition to whatever amount he might receive pursuant to the percentage clause. We would also emphasize that the percentage clause does not result in any additional income to the landlord until and unless the store first attains sales of over $2,294,666 in a particular year. Of some interest is the fact that this figure is considerably higher than the previous record gross sales at the . . . store at the time the lease was entered into. It is thus evident that the percentage clause, although doubtless of considerable interest to the landlord as a hedge against inflation and as a means of sharing in the hoped for success of the store, was not a material part of the lessor's fundamental expectations under the lease. Hence, it cannot be said that the lease was entered into in sole

reliance upon the skill, expertise, and reputation of A&P, and thus there is no reason to find an implied covenant limiting the lessee's right to assign the lease.

*Rowe*, 46 N.Y.2d at 71-72, 385 N.E.2d at 571, 412 N.Y.S.2d at 832. The Court of Appeals reversed the lower court's ruling because it did not believe that income derived from percentage rent on gross receipts was a compelling reason for Rowe's willingness to enter into the percentage lease. Thus, according to the Court of Appeals, the identity of Rowe's tenant was immaterial because even A & P was not going to generate enough gross receipts to produce percentage rent for Rowe.

In the case now before us, the record clearly indicates that Newman entered into a percentage lease with ACS because ACS was a major supermarket operator capable of generating gross receipts sufficient to produce significant percentage rent. Newman's willingness to finance the expansion of the store at 59th and Adams Streets was contingent on the expectation that Newman would receive, in addition to fixed rent, at least $40,000 in annual percentage rent, a 10-percent return on Newman's $400,000 investment in the expansion project. In marked contrast to the percentage rent provision in *Rowe*, which did not become effective until A & P's gross receipts had passed $2,294,666, Newman collected percentage rent on every dollar of gross receipts generated by her tenant. The percentage rent provision was the primary inducement for Newman to renegotiate the lease in 1977 and finance the expansion of the store. Without a healthy income from percentage rent, Newman would not realize a fair return on her investment in the store's expansion.

Newman objected when the tenancy of the store was transferred to Hinky Dinky because Newman did not believe that Hinky Dinky was in the same class with ACS when it came to generating the sales volume necessary to produce the amount of percentage rent anticipated at the time the percentage lease was negotiated. Hinky Dinky claims that it assuaged any reasonable fears harbored by Newman regarding sales volume by providing Newman with evidence of how Hinky Dinky's improved efficiency would enable the store to maintain the competitive pricing necessary to maximize gross receipts.

We note that common sense permits a landlord to question the accuracy of the assertions made by a prospective tenant. It is not unreasonable for a landlord relying on percentage rent to insist on preserving the existing landlord-tenant relationship, and avoid the risk of changing tenants, until that landlord is convinced that the change in tenants—executed in breach of the lease—will not harm his or her interest in maintaining the existing level of percentage rent.

The record indicates that on February 28, 1985, the first genuine occasion of negotiation for Newman's retroactive consent, representatives of Hinky Dinky's presented Newman's representative with what Hinky Dinky calls "a viable business plan for the success of the store." The "plan" was a sheet of paper on which the following entries were handwritten:

Business Plan

1. Entrep - Ownership on Location
2. Non Union Operator - Low Cost - Control Employee Attitudes
3. Discipline of Chain - Flexibility of Independent
4. Take Advantage of Existing Good Name/Reputation
5. Lower Prices To More Competitive Level
6. High Service Level (Result of Lower Costs) (Dept Cross Over)
7. On Site Decision Making - Different Items, Services[,] Pricing[,] Etc
8. Change Ads To Be Best For Store
9. Pick of Crop Mgrs
10. Existing Mkt Knowledge & Experience

The term "pricing" was scribbled in as an addendum to entry No. 7. The plan was nothing more than an outline of generic business maxims that filled less than half of the sheet of paper. The author of the plan was the financial expert for Hinky Dinky in the negotiations and also was the person responsible for ensuring that sales were maximized, but he was not present at the February 28 meeting. Given these facts, we are surprised to find Hinky Dinky taking issue with Newman for not making more of an effort to research Hinky Dinky's figures and projections in the wake of the unauthorized assignment and sublease.

Hinky Dinky also argues that Newman acted unreasonably in focusing so intently on the preservation of the existing level of percentage rent because Newman was presented with what Hinky Dinky calls "a no lose situation." Brief for appellee at 22. Hinky Dinky points out that § 10.1 of the lease states that regardless of any assignment or sublease, ACS would "continue to be primarily and directly liable to Landlord for the payment of all rent and the full performance of all of the covenants and conditions of this Lease." As ACS' assignee, Nash Finch, too, assumed liability for rent and the performance of all covenants of the lease. Thus, reasons Hinky Dinky, if the duty pursuant to § 5.1 of the lease to maximize sales was breached and Newman's income from percentage rent decreased accordingly, then Newman could sue ACS, Nash Finch, and Hinky Dinky for damages pursuant to § 16.1(C) of the lease. Therefore, Hinky Dinky concludes, whether through the status quo or through an action for damages, Newman was assured of getting the same amount of money out of the lease even with Hinky Dinky as the tenant instead of ACS.

We reject Hinky Dinky's version of the no-lose scenario. We do not share Hinky Dinky's belief that the action for damages described immediately above would be a sure winner. If there was no question that, one way or another, Newman was assured of getting a return on the lease commensurate with 1984 levels, then why were the parties to the assignment and sublease unwilling to scrap the percentage rent provision and guarantee Newman a fixed rent equal to the total rent for 1984? If between them ACS, Nash Finch, and Hinky Dinky were going to have to pay Newman $97,000 in either rent or damages, then why did they not agree to pay the higher fixed rent and at least avoid the cost of defending against an action for damages? We suspect that the parties to the assignment and sublease understood that Newman definitely was not in a no-lose situation. A decrease in gross receipts and percentage rent would not automatically result in a successful suit for damages. There was the possibility that even while complying with its duty to maximize sales, Hinky Dinky still might not have been able to match the sales volume generated by ACS. If, in the event of a decline after 1984 in gross receipts and income from percentage rent,

Newman had decided to seek damages for an alleged breach by Hinky Dinky of the duty to maximize gross receipts, the only sure thing for Newman would have been a difficult and expensive lawsuit.

If not for the percentage factor in the lease at issue, Hinky Dinky's argument that Newman's rent was guaranteed by Nash Finch and ACS would be more potent. However, the financial strength of ACS and Nash Finch is of little consequence because a lessor's return on a percentage lease, unlike the return on a fixed rent lease, depends not on the liable parties' solvency but on the tenant's generation of gross receipts. The nebulous character of a percentage lease makes the identity of the tenant a matter of considerable importance, particularly in a case such as this, in which the landlord relied heavily on the percentage rent provision and on the identity of the tenant whose gross receipts would produce the anticipated percentage rent.

· The Newman family had a lessor-lessee relationship with ACS going back to 1961. The lease was renegotiated as a percentage lease in 1977 for the benefit of ACS. Under the percentage lease, Newman received a fair return on her $400,000 investment in ACS' expansion project. The performance of ACS under the percentage lease satisfied Newman's expectations, but each business entity is unique, and given the circumstances of the assignment and sublease at issue, it is understandable that Newman was reluctant to accept Hinky Dinky as her new tenant.

We hold that in the context of a percentage lease, where a percentage rent provision is a crucial component of the lease and where a lessor withholds consent to an assignment or a sublease on grounds that the proposed assignee or sublessee will be unable to provide the anticipated income from percentage rent, the lessee bears the burden of proving that the lessor was unreasonable in refusing to consent to the assignment or sublease. Although we have given deference to the trial court in our review of its factual findings, see *Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 481 N.W.2d 416 (1992), we find clearly wrong the trial court's determination that Newman was unreasonable in withholding consent. Instead, we find that Hinky Dinky failed to meet its burden of proving that Newman

was unreasonable in refusing to consent to the transactions at issue.

## V. CONCLUSION

We find that the trial court erroneously assigned to Newman the burden of proof on the issue of whether Newman was unreasonable in withholding consent to the assignment and sublease. This error was not harmless because, although we find that Newman was reasonable in withholding consent to the assignment and sublease, the record might read quite differently if the trial court had properly assigned the burden of proof to Hinky Dinky. Had it been assigned the burden of proving that Newman was unreasonable, Hinky Dinky might have adduced more or different evidence than what is currently before us. Hinky Dinky deserves the opportunity to make the case against Newman with notice that it bears the burden of proving that Newman was unreasonable in withholding consent to the assignment and sublease. Therefore, we reverse the judgment of dismissal, and we remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.