**Allan J. NORVILLE and Kenai Plaza/Carr's–Safeway, L.L.C., Appellants/Cross–Appellees,**

v.

**CARR–GOTTSTEIN FOODS CO., Appellee/Cross–Appellant.**

**Nos. S–10643, S–10684.**

Supreme Court of Alaska.

Feb. 6, 2004.

Gregory A. Miller, Peter C. Nosek, Birch, Horton, Bittner, & Cherot, Anchorage, for Appellants/Cross–Appellees.

William J. Evans, H. Ryan Fortson, Dorsey & Whitney LLP, Anchorage, for Appellee/Cross–Appellant.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

MATTHEWS, Justice.

## INTRODUCTION

The question presented is whether a landlord's refusal to consent to a sublease was unreasonable. The superior court granted summary judgment in favor of the tenant on this issue. We conclude that this was error because there were genuine issues of material fact and the tenant was not entitled to judgment as a matter of law.

## FACTS AND PROCEEDINGS

Allan Norville owns a shopping center in Kenai. Beginning in 1991, Carr–Gottstein Foods Co. (Carrs), leased space in the center under a twenty-five year lease. In 1995 Carrs asked Norville to consent to a sublease for a Bank of America branch. Article 13 of the lease required Carrs to seek Norville's consent prior to subletting and provided that consent was not to be withheld unreasonably. Norville initially did not consent to the sublease. He explained:

> I have not granted permission to proceed for currently I am discussing the possibility of locating a bank branch on one of the pads at the center. I have agreed with the prospective tenant that if a bank is located on the pad, the balance of the center would be restricted and no other bank will be located in the shopping center. The covenant would be similar to the covenant in our lease, wherein I am not allowed to place another food store on the site.

But a week later, after receiving a call from John Cairns, Carrs president, Norville consented. He stated that he did so for two reasons: "[F]irst because [Cairns] is a personal friend ... and, second, the fact that Carrs had a large amount of long-term debt and the added cash flow would help the company." In his letter granting consent Norville wrote that "the consent to allow the Bank of America branch shall in no way be construed as a waiver of our rights under the lease."

Bank of America operated a branch bank in the center as a subtenant of Carrs until April of 1999. In early 1999 Safeway, Inc., purchased all the shares of Carrs and Carrs became a subsidiary of Safeway. Since all post-acquisition dealings between the parties involved Safeway employees, we refer to Carrs after the acquisition as "Safeway."

In July 1999 Safeway wrote Norville requesting that he consent to a sublease to Alaska USA Federal Credit Union. The proposed area was the same space that had been previously occupied by Bank of America. Safeway's property manager, Jeanese Riggs, contacted Norville to follow up on the request. According to Riggs, Norville "advised me that he would not consent to the sublease unless he was given a percentage of the sublease rent. He claimed he was entitled to this because his ability to negotiate with another bank to locate in his shopping plaza would be adversely impacted."

In subsequent communications, Norville indicated that he would approve the sublease for seventy-five percent of the rent paid by Alaska USA, an amount just under $3,000 per month. According to Norville, he conditioned his consent upon receiving a portion of Alaska USA's rent because he "was still planning to develop a bank on the bank pad of the center," and he had "continued concerns that any other bank would be put off by an Alaska USA in-store bank ... competing with it in the same shopping center." He stated that he "feared that the prior existence of the BofA branch office was one of the reasons why [he] still had no bank tenant, and that if [he] could find such a tenant the market rate [he] could charge would be diminished by the Alaska USA branch within Carrs." He also stated that he was motivated in part by concerns that this was the first step in a series of subleases to which Safe-

way would "demand consent" in order to reduce its own operations in the center.

In September 1999 Safeway accepted Norville's terms under protest. Safeway made it clear that it believed that Norville did not have reasonable grounds for conditioning his approval of the sublease and stated, "we ... intend to pursue this matter...." Alaska USA began operating in the subleased space in August of 1999 and continues to do so.

In June 2001 Safeway sued Norville, alleging that his withholding of consent for the Alaska USA sublease was unreasonable and in violation of the lease. Safeway sought a declaration that Norville was required to consent to the sublease unconditionally and asked for judgment for the amount of the sublease rental paid to Norville.

After Norville answered and some discovery was conducted, Safeway moved for summary judgment. Safeway's theory was that Norville had withheld consent to the sublease solely on the basis of the intended use of the space for banking. Safeway argued that under the lease it had the right to use its store for any services offered in similar stores, and that banking is one such service. Since that use was permitted under the lease, Safeway argued that it was unreasonable for Norville to withhold consent to the sublease.

In response, Norville argued that the reasonableness of his conditional consent was a question of fact. Norville also took issue with the contention that the lease permitted banking as a use. Finally, Norville argued that use was not the sole basis for his refusal.

After oral argument, the superior court granted summary judgment for Safeway. The final judgment entered required Norville to refund thirty-one monthly payments from the Alaska USA sublease, amounting to $91,930.50, plus interest, costs, and attorney's fees.

#### Relevant lease provisions

As already indicated, the term of the Norville–Carrs lease was twenty-five years. Approximately 70,992 square feet were leased. A minimum annual rent of $851,904 was specified, and a percentage rent was to be charged to the extent that it exceeded the minimum. The percentage rate was two percent for gross sales exceeding $40,000,000 to be reduced to one-and-a-half percent on gross sales exceeding $50,000,000. "Gross sales" do not encompass "minimum and base rents from subtenants." The tenant is required to "use, occupy, operate and conduct its business in the entire Demised Premises in such manner as to produce the maximum volume of Gross Sales...."

The two most important clauses to the resolution of this dispute are the "Tenant's Use Clause" and the "Assignment or Subletting Clause."

The Tenant's Use Clause, section 1.1(i) provides:

Tenant shall use the Demised Premises for the principal purpose of conducting thereon a general food supermarket including sales of deli-type foods for on-premises consumption, with the privilege of including in the Demised Premises a drugs and toiletries department, a notions department, a variety and soft goods department, a housewares and hardware department, a ready-to-wear clothing and accessory department, a prescription pharmacy, an automotive accessory and supply department, a floral department, a photo/sound/video department and a department or departments selling other items or offering such services compatible with the items or services offered by Tenant for sale in the foregoing enumerated departments and items sold and services offered from time to time in other general food supermarkets operated by Tenant or others. Tenant may also use the Demised Premises to the extent incidental to the uses described above, for the installation and use of one or more machines and/or devices which effect or facilitate the transfer, crediting and /or debiting of funds, the determination of account balances, the cashing of checks and/or any and all functions relating to such type of activities as may now or in the future be performed or facilitated by machines and/or devices. Tenant shall not use the Demised Premises for any other principal use or purpose without the prior written consent of Landlord.

The Assignment or Subletting Clause provides in relevant part:

13.1 Tenant expressly covenants that it will not assign this Lease or any interest therein, nor sublease or suffer or permit the Demised Premises or any part thereof to be used by others, without the prior written consent of Landlord in each instance, which consent will not be withheld unreasonably....

....

13.4.... If Landlord shall consent to any particular assignment or subletting, such consent shall be deemed consent to that particular transaction only and not to any other or future transaction.

## Contentions

On appeal both parties treat Norville's consent to the Alaska USA sublease conditioned on receiving seventy-five percent of the rent paid by Alaska USA as equivalent to a refusal to consent to the sublease. We accept this characterization.

Norville argues that whether his refusal to consent to the Alaska USA sublease was unreasonable is a question of fact that should not have been resolved by summary judgment. He contends that he withheld consent for two reasons. The first was because of "his long-standing desire to find a full-service bank to lease a 'bank pad' in another part of the shopping center." The second was related to rent receipts on Safeway's premises. He points out that by subleasing to a bank the space used by the bank no longer contributes to gross sales and thus to rent calculated on a percentage basis. He contends that these reasons, considered either individually or collectively, justified his withholding of consent.

In response to Norville's first reason for withholding consent, Safeway argues that the motive to lease other space in the center to a bank is unreasonable as a matter of law because under the Tenant's Use Clause it was entitled to use its premises for banking. Safeway stresses that Norville's "objection was use. He did not want a bank in the supermarket. Since the use clause gives [Safeway] the right to put an in-store branch bank in the premises, Norville's objection to Alaska USA was unreasonable as a matter of law." According to Safeway, its allegation that Safeway is permitted under the use clause to install a branch bank also answers Norville's argument that he withheld consent to the sublease because it would not contribute to gross sales: "Where the terms of the governing lease give [Safeway] the right to the activity, any disadvantage imposed on Norville is irrelevant. As just shown, in-store banks are included in [Safeway's] right to offer 'items sold and services offered from time to time in other general food supermarkets operated by tenant or others.' "

Norville, in turn, contests the claim that branch banking is a permitted use. He contends that specific language in the use clause permits only machine based banking activities and that this language controls the permission to engage in branch banking that might otherwise be found in the general language of the use clause.

## DISCUSSION

 One premise of Safeway's argument is that under the lease Norville must consent to any sublease that is for a use that would be permitted under the Tenant's Use Clause if conducted by Safeway. A second premise is that banking is a permitted use under the Tenant's Use Clause. We believe, for the reasons that follow, that the first premise is incorrect as a matter of law, and the correctness of the second premise depends on unresolved extrinsic evidence.[1]

### Can the landlord object to a sublease for uses that would be permitted to the tenant?

 We turn first to Safeway's argument that Norville cannot object on the basis

---

1. Grants of motions for summary judgment are reviewed de novo. They will be affirmed if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Therchik v. Grant Aviation, Inc.*, 74 P.3d 191, 193 (Alaska 2003). On review, all reasonable inferences of fact are drawn in favor of the nonmoving party. *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002). Questions of contract interpretation are generally questions of law that will be reviewed de novo. However, fact questions are created when the meaning of contract language is dependent on conflicting extrinsic evidence. *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School Dist.*, 778 P.2d 581, 584 (Alaska 1989).

of use to a sublease for a use that would be permitted to Safeway. The language of the lease does not support Safeway's contention. The subletting clause does not specify any limitation on the right of the landlord to withhold consent other than reasonableness. Further, the Tenant's Use Clause limits permitted uses to those by "a department," a term that in normal usage would not encompass a subtenant. The applicable language of the use clause, elided for ease of understanding, is as follows: "Tenant shall use the Demised Premises for the principal purpose of conducting thereon a general food supermarket ... with the privilege of including in the Demised Premises ... a department ... selling other items or offering ... items sold and services offered from time to time in other general food supermarkets...." The normal meaning of "department" used in this context is "a division of a store handling a distinct class of merchandise <the furniture ˉ> <dry goodsˉ>." [2] This would not seem to encompass a space leased to a separate entity.[3] The prohibition of subletting without consent, together with the Tenant's Use Clause's definition of permitted uses as those by "a department," suggest that the lease does not erect a categorical rule barring the landlord from withholding consent on the basis of use to a proposed sublease that entails uses that would be permitted to the tenant.

Further, there are practical reasons why withholding consent in such circumstances might be reasonable. The scale of a tenant-operated department under the use clause might be expected to be smaller than the operations of a separate store. For example, the quantity of the hardware offerings found in a typical supermarket is much less than in a hardware store.

Why would scale make a difference to a landlord? One reason may be that the particular use in question is less remunerative in rent per square feet to the landlord than core supermarket uses. This would have an impact on percentage rents. The landlord, to use the hardware example, might be willing to tolerate the relatively small commitment in square feet to hardware sales that would be expected in a supermarket hardware department, but could reasonably object to the larger commitment of space necessary for a full-scale hardware store.[4] Another reason might be that the landlord is seeking to attract a store as a primary tenant in the same complex that would be in competition with the proposed subleasee. While the scale of the competition offered by sales from a department of the supermarket might not deter the prospective new tenant from taking space in the shopping center, the greater competition offered by a subleasee could well be a deterrent.

These examples parallel the reasons offered by Norville in opposition to summary judgment. Norville's reasons—concerns about competition with a primary tenant and about the fact that the subleased space would not be contributing to gross sales for purposes of percentage rent calculations—seem plausible. They are consistent with reasons found to be acceptable in a number of cases involving shopping centers.

In general, the standard is that a sublease may be refused if doing so is commercially reasonable.[5] It is not reasonable for a landlord to deny consent in order to charge a higher rent than he originally contracted for.[6] A landlord's

2. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 604 (1968).

3. In interpreting contracts, as well as statutes, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *State v. Niedermeyer*, 14 P.3d 264, 272 n. 38 (Alaska 2000) (citation omitted); *Day v. A & G Constr. Co.*, 528 P.2d 440, 447 (Alaska 1974). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. a: "Unless a different intention is shown, language is interpreted in accordance with its generally prevailing meaning. *See* § 202(3)." Section 202(3) provides "[u]nless

a different intention is manifested, (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."

4. Such a sublease could violate the tenant's duty under the lease to use the space to maximize gross sales. *See supra* p. 999.

5. *Kendall v. Ernest Pestana, Inc.*, 40 Cal.3d 488, 220 Cal.Rptr. 818, 709 P.2d 837, 845 (1985).

6. *Id.*

desire for a better bargain than contracted for has nothing to do with the permissible purposes of the restraint on alienation—to protect the lessor's interest in the preservation of the property and the performance of the lease covenants. " '[T]he clause is for the protection of the landlord *in its ownership and operation of the particular property*—not for its general economic protection.' " [7]

■ Refusing to consent to a sublease because a proposed subtenant would compete with other businesses in the center and thereby potentially prejudice the landlord's relationship with other tenants has been recognized as a permissible basis for withholding consent.[8] Refusing to consent to a sublease because gross sales, and thus percentage rents, will be impaired is likewise a legitimate reason.[9] Under the current lease, Norville's interest in maximizing gross sales is recognized by an explicit covenant. Thus, Norville's reasons for withholding consent are not impermissible under the lease's explicit terms. Whether they are genuine and reasonable under the circumstances of this case are questions of fact that remain to be litigated.

### Is general branch banking a permitted use?

■ Safeway argues that because many supermarkets contain banks, banking is a service "offered from time to time in other general food supermarkets" and thus is a permitted use under the first sentence of the Tenant's Use Clause. Neither party contests

that currently, as well as in 1990, many supermarkets contain branch banks. But Norville argues that the second sentence of the use clause specifically addresses the only type of banking permitted under the lease. The second sentence provides:

> Tenant may also use the Demised Premises to the extent incidental to the uses described above, for the installation and use of one or more machines and/or devices which effect or facilitate the transfer, crediting and/or debiting of funds, the determination of account balances, the cashing of checks and/or any and all functions relating to such type of activities as may now or in the future be performed or facilitated by machines and/or devices.

Norville argues that the language "the transfer, crediting and/or debiting of funds, the determination of account balances, the cashing of checks and/or any and all functions relating to such type of activities" refers to banking functions. He contends that because the only banking functions permitted under the lease are those that are performed by machines, the second sentence operates as a limitation on the type of banking permitted under the lease. Safeway counters that the second sentence is permissive rather than restrictive because it begins "[t]enant may also use." Norville responds that the first sentence does not expressly mention banking and that, in context, the second sentence must be read as a limitation that excludes, by implication, banking functions not conducted by machines, otherwise it would have no meaning.

---

**7.** *Id.* (quoting *Ringwood Assocs. v. Jack's of Route 23, Inc.*, 153 N.J.Super. 294, 379 A.2d 508, 512 (1977)).

**8.** *See, e.g., Warmack v. Merchants Nat'l Bank of Ft. Smith*, 272 Ark. 166, 612 S.W.2d 733, 735 (1981) (landlord's desire to maintain a good "mix" of tenants held to be reasonable justification for withholding consent to a sublease which would have added a second bank to shopping center); *Pay 'N Pak Stores, Inc. v. Superior Court*, 210 Cal.App.3d 1404, 258 Cal.Rptr. 816, 819 (6 Dist.1989) (shopping center landlord's refusal to consent to a sublease because proposed subtenants sold products the landlord also sold held reasonable).

**9.** *See, e.g., Newman v. Hinky Dinky Omaha–Lincoln, Inc.*, 2 Neb.App. 555, 512 N.W.2d 410

(1994) (landlord was reasonable in withholding consent to a sublease where the existing landlord-tenant agreement involved a percentage rent scheme); *Worcester–Tatnuck Square CVS, Inc. v. Kaplan*, 33 Mass.App.Ct. 499, 601 N.E.2d 485, 489 (1992) (landlord reasonably withheld consent to sublease where a percentage rent agreement was in place, even though the agreement could only be initiated if the tenant's sales exceeded a designated volume level, and such level had never been achieved); *Haack v. Great Atl. & Pac. Tea Co.*, 603 S.W.2d 645, 652 (Mo.App. E.D.1980) (landlord's refusal to consent to sublease because of percentage rent aspect of lease agreement held to be a reasonable exercise of business judgment).

Norville also argues that relevant extrinsic evidence clarifies the meaning of the use clause. In opposition to Safeway's motion for summary judgment, Norville filed a lengthy affidavit. The affidavit discusses the conversations leading to the execution of the lease in late 1990 between Norville and Michael Moxness, Carrs' attorney. The affidavit states in relevant part:

One of the issues discussed with Mr. Moxness was the right to install in-store banking ATMs in the store.

In the development plan for the shopping center, various building pads were located on the periphery of the center. One of the pads was designated to be used for a future bank location, and accordingly in the negotiations I never consented to a bank being located in the Carrs Grocery Store.

During the course of negotiations various issues were discussed with Mr. Moxness concerning the uses that would be allowed in the center. The negotiations resulted in reaching the agreement as set forth in Paragraph 1.1(i). Carrs was permitted to use the premises as a general food supermarket, and Carrs could install automatic teller machines (ATMs). The intent of the restriction was to allow me, as the developer, to place a full service bank on the bank pad designated for that development, and to allow Carrs to install only ATMs.

Norville's affidavit may merely be referring to a subjective intent that was never expressed in discussions with Moxness. If so, it would not serve as relevant extrinsic evidence. Testimony of a party as to his subjective intentions concerning the meaning of a particular clause in a contract is not probative unless the party in some way expressed or manifested his understanding at the time of contract formation.[10] But in

reviewing grants of summary judgment we are required to view the evidence submitted in opposition to a motion for summary judgment in a light most favorable to the opponent, resolving all reasonable implications that can be drawn from such evidence in favor of the opponent.[11] Viewed using this standard, Norville's affidavit implies that the question whether Carrs would be allowed to place a full-service bank on its premises was discussed at the time the lease was entered into and the negotiating parties agreed that only ATMs and similar machines would be permitted. As so construed, the affidavit presents probative extrinsic evidence.

In response to Norville's affidavit, Safeway filed an affidavit of Moxness. Moxness stated that he had no recollection of Norville requesting an exclusion for general banking and that he would not have granted such an exclusion. With reference to the Tenant's Use Clause language relating to bank machines, Moxness stated:

I do not recall this language as being a compromise for excluding banks or financial institutions from the Tenant's Use Clause. I believe the same ATM language was typically included in other Carrs lease agreements. Had such language been a compromise for the use of banks, it would have been highly unusual not to expressly include in the Retail Lease Agreement that banks were excluded from the Tenant's Use Clause.

As independent supporting extrinsic evidence and in contradiction to Moxness's affidavit, Norville offered evidence that identical use clauses were used in other 1990 leases between Carrs as tenant and Labar Co., a partnership in which the principal owners of Carrs were general partners, as landlord.[12] Norville cited evidence that after Carrs was sold to Safeway, Safeway requested the La-

---

10. *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981):

Differences of opinion among the parties as to their subjective intent, expressed during the litigation, do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract, since such self-serving statements are not considered to be probative. Rather, the court must look to the express manifestations of each party's

understanding of the contract in attempting to give effect to the intent behind the agreement.

11. *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002).

12. In one of the leases L.J. Carr signed as president of the tenant, Carrs, and as general partner of the landlord.

bar Co. partnership to give its consent to a sublease to a bank, and this consent was denied. Norville argues that this is evidence that the principals of Carrs in 1990 intended the language of the use clause to permit only ATMs and similar machines, not general banking.

 The objective of contract interpretation is to determine and enforce the reasonable expectations of the parties.

In determining the intent of the parties the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made. The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties.[13]

Interpretation of a contract is ordinarily a question of law. But interpretation "becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning." [14]

In this case the Tenant's Use Clause can reasonably be interpreted to allow only banking by machine. Norville's affidavit concerning negotiations leading up to the lease is extrinsic evidence that supports this interpretation. The fact that this extrinsic evidence is refuted by Moxness's affidavit does not mean that summary judgment was justified. Instead, the refutation merely means that there was a genuine issue of material fact as to what the extrinsic evidence meant.

The evidence regarding Carrs' former principals' refusal to allow Safeway to place a bank in another shopping center under identical lease language is not very detailed. It is possible that the landlords refused to consent to the proposed sublease on grounds different than those involved here. Thus, while the transaction may prove to be a source of relevant extrinsic evidence on remand, we are unable to say at this point that it has probative effect.

 As noted, Norville argues that the specific language concerning banking functions in the second sentence of the Tenant's Use Clause modifies the permission that might otherwise be inferred from the general language of the first sentence. This is a position with at least surface appeal. Since many supermarkets contained banks in 1990, the second sentence would seem to have little or no meaning unless it were intended to be a limitation. In contracts, as in statutes, "where one section deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is a conflict, the specific section will control over the general." [15] Here the two sentences can be harmonized if the first is understood not to cover banking. Or, if the first sentence is understood to include banking, the sentences can still be harmonized if the limitations of the second sentence are construed to apply to the permission to provide banking services granted in the first. But we have no occasion to rule on this argument at this time, for Norville did not move for partial summary judgment. If he had, it is possible Safeway would have been able to offer extrinsic evidence or arguments as to the meaning of the use clause that would contradict Norville's interpretation.

13. *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996) (citations omitted).

14. *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997) (citing *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim School Dist.*, 778 P.2d 581, 584 (Alaska 1989)).

15. *Estate of Hutchinson*, 577 P.2d 1074, 1075 (Alaska 1978). *See also, McGary v. Westlake Investors*, 99 Wash.2d 280, 661 P.2d 971, 974 (1983) (en banc) (specific language of lease ad-

dendum must prevail over general terms of lease provision); *Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 658 A.2d 31, 35 (1995) ("As a matter of contract construction, the specific controls the general."); *In re MacMillan*, 204 B.R. 378, 401 (Bkrtcy.S.D.N.Y.1997) ("Definitive, particularized contract language generally takes precedence over expressions of intent that are general, summary or preliminary."); 5 MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.23, at 253–4 (1998).

**Other arguments raised by Safeway**

■ Safeway argues that the parol evidence rule precludes consideration of the extrinsic evidence offered by Norville. "The parol evidence rule is a rule of substantive law which holds that an integrated written contract may not be varied or contradicted by prior negotiations or agreements."[16] Three determinations have to be made before the parol evidence rule can be applied: "(1) whether the contract is integrated, (2) what the contract means, and (3) whether the prior agreement conflicts with the integrated agreement."[17] Here we can assume that the contract is integrated. The critical question is what the contract means. On this question extrinsic evidence is relevant. "Extrinsic evidence may always be received on the question of meaning."[18] Thus Safeway's argument on this point lacks merit.

Safeway also argues that two other grounds preclude Norville from taking the position that he does concerning the meaning of the use clause. Safeway argues that the statute of frauds, AS 09.25.010(a)(1), and a lease estoppel certificate signed by Norville act as bars to Norville's position. These arguments both lack merit for they assume that the lease clearly permits branch banking under the use clause, whereas the actual language, even without consideration of extrinsic evidence, leaves this question in substantial doubt.

**CONCLUSION**

For the above reasons the judgment of the superior court is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

---

**16.** *Alaska Diversified Contractors,* 778 P.2d at 583.

